UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                               :

DANNY ATTENBOROUGH, et al.,     :
                               :

         Plaintiffs,       :

                               :          03 Civ. 4399 (RJH)

     - against -      :

                               :      **MEMORANDUM OPINION**

CONSTRUCTION AND GENERAL     :      **AND ORDER**
BUILDING LABORERS' LOCAL 79,  :

                               :

         Defendant.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

       Plaintiffs, twenty-one individual former or current members of defendant,

Construction and General Laborers' Local 79 ("Local 79" or the "Union"), bring this

putative class action on behalf of themselves, and all other minority members of Local

79, alleging class-wide causes of action under Title VII of the Civil Rights Act of 1964

(2000) ("Title VII"), 42 U.S.C. § 2000e et seq., the Civil Rights Act of 1866, 42 U.S.C. §

1981 (2000) ("Section 1981"), New York Human Rights Law, N.Y. Exec. Law § 296

(McKinney 2005), Title 8 of the Administrative Code and Charter of the City of New

York, N.Y.C. Admin. Code § 8-107 et seq., and New York State Civil Rights Law, N.Y.

Civ. Rights Law § 43.  Individual plaintiffs James Bynum, Cecil Bell, Thomas Flowers,

and Alex Wright additionally allege claims of retaliation due to their filing of charges of

discrimination with the Equal Employment Opportunity Commission ("EEOC"), in

further violation of Title VII, New York Human Rights Law, N.Y. Exec. Law § 296, and

Title 8 of the Administrative Code and Charter of the City of New York, N.Y.C. Admin.

Code § 8-107 et seq.  All plaintiffs seek declaratory and injunctive relief, declaring that

Local 79 has violated their civil rights and those of the putative class, and enjoining

defendant from continuing the discriminatory conduct alleged in the Third Amended Complaint.  In addition, plaintiffs seek equitable and monetary relief in the form of back pay, punitive damages, nominal damages, and incidental monetary relief, as well as attorney's fees and costs.

This opinion follows the Court's March 29, 2006 order denying plaintiffs' motion for certification of a class without prejudice to renew.

## BACKGROUND

Except as otherwise indicated, the following facts are taken from plaintiffs' Third Amended Complaint ("TAC") and exhibits attached to their class certification motion, and are assumed to be true for purposes of this motion.  In this motion, plaintiffs seek certification of a class of

> [a]ll minority members of Local 79 who at any time relevant to this action were or are listed on the Local 79 Out-of-Work List, or who have informed Local 79 of the fact that they were out of work and requested to be placed on the Out-of-Work List, and all minority members of Local 79 who at any time relevant to this action had a shop steward certification from Local 79 or were eligible to obtain a shop steward certification from Local 79.

(TAC ¶ 28.)

Plaintiffs allege intentional discrimination as part of a pattern-or-practice of intentional discrimination (*id.* ¶ 107), and discriminatory impact claims under federal and state law (*id.* ¶ 105).  According to plaintiffs, Local 79 union officials regularly bypass the union's otherwise fair and objective referral rules and practices (the maintenance of an "out-of-work list") and instead refer the best jobs to friends and relatives through an informal "behind-the-scenes operation."  (*Id.* ¶¶ 38, 69–73, 99.)

1.  <u>The Union</u>

Defendant in this action, Local 79, is a local trade union of construction and general laborers in the New York Metropolitan area, with approximately 7500 active members working in the construction and demolition business in New York City.  (*Id.*  ¶¶ 31–32.)  Local 79 is a member union of the Mason Tenders District Council of Greater New York (the "MTDC"), an umbrella organization for six affiliated local unions in the building and construction industry.  (*Id.* ¶ 33; John Delgado Declaration Sept. 22, 2005 ("Delgado Decl.") ¶ 3.)  Both the MTDC and Local 79 are governed by the Laborers' International Union of North America ("LIUNA"), the governing body for all local unions of general labors in the country.  (TAC ¶ 34.)  In 1995, LIUNA and the United States Attorney General entered into a Consent Decree,[1] pursuant to which LIUNA agreed to adopt specific job referral rules to be followed by all its locals, and to be supervised by the General Executive Board Attorney and an independent monitor.  (*Id.* ¶¶ 40, 43.)  Also pursuant to the Consent Decree, all the general laborers' local unions in the New York City area were consolidated into Local 79, and as a result Local 79 became the central union hall for all general laborers in the New York City area.  (*Id.* ¶ 45.)

From the time Local 79 was consolidated to present, the Union's Hiring Hall has had two Directors:  William Schmidt from April 1996 through May 2004, and Denise Echevarria from May 2004 to Present.  (Delgado Decl. ¶ 10.)  The Hiring Hall has also had a number of Business Managers:  Joseph Speziale from around July 2000 through October 2001, Keith Localzo from November 2001 to November 2004, Kenneth

---

[1] The Consent Decree, signed on February 13, 1995, arose out of a matter captioned *United States v. Laborers' International Union of North America, AFL-CIO*, filed in the United States District Court of the Northern District of Illinois, Eastern Division.  This suit sought to end the influence of organized crime in the union.  A copy is attached to plaintiffs' class certification motion as Exhibit 4.

Brancaccio from December 2004 through May 2005, and John Delgado from June 2005 to present. (*Id.*)

Following the 1996 consolidation, Local 79 began to implement a system for referring out work. (TAC ¶ 46.) Initially, the referral system simply comprised a list whereby Local 79 members would call the Union looking for work, the Union would record the member's name on a list and as referral opportunities arose, the members on the list would be sent out on a first-come, first-served basis. (*Id.* ¶ 47.) Eventually the rules governing the out-of-work list became more elaborate, and included different tiers of priority based on an individual's hours of experience, and various means by which an individual on the out-of-work list might retain or lose their position on the list. (*See* James Gerald Bynum Deposition, June 23, 2005 ("Bynum Dep.") 29:06–29:23, 68:05–68:18, Pls.' Ex. 5; Construction and General Building Laborers, Local 79 Hiring Hall Rules ("Hiring Hall Rules"), Delgado Decl. Ex. 2; *see also infra* (discussing the out-of-work list as currently maintained under Local 79's Hiring Hall Rules).)

In New York City, collective bargaining agreements ("CBAs") require that all laborers must be (or soon become) members of Local 79. (TAC ¶ 49.) The standard CBA between the union and local contractors gives the contractor the right to select fifty percent of the general laborers, and gives Local 79 the right to select the remaining 50 percent. (*Id.* ¶ 50; *see also* Delgado Decl. ¶ 5.) On each new job, Local 79 also has the right to send out one general laborer who will be designated as the union's shop steward, who is always the first or second laborer assigned to the job, the first entitled to overtime, and the last or second to last to be laid off. (TAC ¶¶ 49–50; *see also* Delgado Decl. ¶ 5.)

The role of the shop steward is to report to a union "Business Agent"[2] any information

relevant to the protection of union members' rights while on the job.  (TAC ¶ 51.)

   2.   The Out-of Work List[3]

       According to plaintiffs, the initial and fair first-come, first-served referral system

established in 1996 (*id.* ¶ 47) quickly gave way to the alleged nepotistic and cronyistic

referral system that forms the basis of this action (Bynum Dep. 171:20–74:21).

       The official referral system involves the maintenance of an "out-of-work list" that

is posted on a weekly basis on a bulletin board at the hiring hall.  (TAC ¶ 53.)  The out-

of-work list, as currently maintained, lists the members, their preferences, qualifications,

and certifications.  (*Id.*  ¶¶ 53–57; *see also* TAC, Exs. 1–4.)  In order to gain a slot on the

list, out-of-work members ("applicants") must complete a signed and dated referral form

stating, *inter alia*, "skills the applicant possesses and jobs the applicant is able to perform,

including any relevant licenses or certifications, and the locations within the five

boroughs of New York City to which the applicant is willing to be referred." (Hiring Hall

Rules § 1.A.)  Once registered on the list, applicants are referred to jobs on a first-in,

first-out basis, subject to various exceptions and restrictions.

---

[2] Local 79 employs twenty to twenty-five Business Agents, who are typically assigned to specific geographic areas within New York City.  (TAC ¶ 52.)  A shop steward, therefore, would report to the Business Agent responsible for the geographic area in which the job is located.  (*Id.* ¶ 51.)  Business Agents report to the union's Business Manager or Assistant Business Manager.  (*Id.* ¶ 52.)

[3] Where indicated, this Opinion's description of the out-of-work list is drawn from defendant's submissions.  Primarily the description is drawn from the Local 79 Hiring Halls Rules. (Construction and General Building Laborers, Local 79 Hiring Hall Rules ("Hiring Hall Rules"), Delgado Decl. Ex. 2.) According to John Delgado, Local 79's current Business Manager, the Hiring Hall Rules have been approved by the General Executive Board Attorney and by the local membership.  (Delgado Decl. ¶ 7; *see also* Union Const. Job Referral Guidelines § 1 at 87, Delgado Decl. Ex. 3 (stating guidelines for obtaining approval for any local deviations from the LIUNA referral guidelines).)  Plaintiffs have not contested the legitimacy of the Hiring Hall Rules submitted by defendant.  Indeed, plaintiffs' allegations in this action do not arise out of the rules governing the maintenance of the out-of-work list, but instead out of defendant's alleged practice of bypassing the Hiring Hall Rules in order to provide the best jobs to friends and relatives. (*See, e.g.*, TAC ¶¶ 38, 53–57, 69–73, 99.)

The first limitation on the first-in, first-out practice is an individual applicant's own skills and/or preferences.  This is because an applicant will not be referred to a job that requires qualifications or experience the applicant does not have, nor will an applicant be referred to a job of a type he is unwilling to perform or in a location to which he is unwilling to travel.  (Hiring Hall Rules § 2.A.)  Later applicants may also receive job referrals before earlier applicants based on hours of experience.  The list is divided into four sub-categories, or tiers, of priority (Lists A through D) based on the amount of laborers' lifetime hours of work at the trade.  (Hiring Hall Rules § 7.A.)  Requests by employers for workers are filled first from the "A List"; therefore until there are no more applicants on List A within a given work and geographic category, no workers from the B, C, or D Lists seeking the same work in the same borough will be called, even if those workers applied to the list before a worker on the A List.  (*Id.* § 7.B.)  A later applicant may also be called ahead of earlier applicants on the list if, within sixty calendar days of being referred to an employer, that employer specifically requests the later applicant, provided that worker's preferences as stated on his most recent referral form comply with the criteria of the job at issue.  (*Id*. § 2.B.)  In addition, a later applicant may receive a referral before an earlier applicant when the referral comes in from an employer who has terminated the earlier applicant for cause, or previously rejected and deemed the earlier applicant unsatisfactory for work in writing.  (*Id.* §§ 2.H–2.I.)

An applicant can lose his position on the list for various reasons.  For example, once a laborer is referred to a job from the list, or has obtained a job directly from the employer, he will remain in the same position on the list, until he has been employed, by one or more employers, for fifteen cumulative days.  (*Id.* §§ 1.C, 2.C.)  However, after

fifteen cumulative days of employment, the applicant is placed back at the bottom of the applicable out-of-work list.  (*Id.*)  An applicant who refuses or is unavailable (without notifying the union in writing) for three consecutive referrals is also moved to the bottom of the applicable list.  (*Id.* § 2.E.)  If an applicant gives written notice of a period of unavailability, he can maintain his position on the list, until his cumulative period of unavailability has exceeded thirty calendar days, at which point he will be moved to the bottom of the applicable list.  (*Id.*)  An applicant may also lose his position on the list if he fails to inform Local 79 of any jobs obtained at the trade within twenty-four hours of obtaining such job.  (*Id.* § 1.C.)  In addition to being dropped to the bottom of the list, an applicant who fails to inform Local 79 of work received outside the list, will be removed from the list for a fourteen-day period during which the applicant would have otherwise been registered and eligible for referral.  (*Id.*)  Finally, an applicant's registration on the list is effective on a quarterly basis, and failure to re-register availability for referrals within the first five business days of a quarter will result in the loss of the applicant's position on the list from the prior quarter.  (*Id.* § 1.F.)

3.  <u>Shop Steward Appointments</u>

As discussed above, a shop steward is one of the first laborers sent out by the union on any new job.  Plaintiffs allege that "[r]eceiving a shop steward assignment is . . . attractive because the shop steward has the most job security, is the first hired and the last fired, has the first option on overtime, tends to accumulate more overtime pay, is generally required to do less demanding physical work, and often does not have to be on the job site in order to be paid."  (TAC ¶ 63.)

According to the Hiring Hall Rules, the Business Manager's responsibility to appoint and supervise stewards is governed solely by the LIUNA Uniform Local Constitution.  (Hiring Hall Rules § 2.K; Uniform Local Union Constitution of the Laborers' International Union of North America Art. IV § E(3) (2001) ("Union Const."), Delgado Decl. Ex. 3.)  As such, shop stewards are not referred to a job according to the date they register on the out-of-work list, but rather are appointed to the job by the Business Manager, apparently according to his discretion.  (*See* Union Const. Art. IV § E(3).)  Local 79's Business Manager proffers that the decision to appoint someone as shop steward is "based on their qualifications and the needs of a particular job." (Delgado Decl. ¶ 8(c).)[4]  Plaintiffs, however, claim that shop steward appointments are the result of insider connections, as opposed to merit or some assessment of qualifications.  (*See, e.g.*, Bynum Dep. 234:19–235:17 (identifying, as an example of defendant's unfair appointment practice, the husband of Kenny Brancaccio's[5] secretary, who received repeated appointments to shop steward positions despite being new to the business and, according to Bynum, a "moron"); *see also infra* (discussing plaintiffs' apparent allegations of discrimination with respect to shop steward appointments in further detail).)

In order to be eligible to serve as shop steward, a laborer must complete courses provided by the MTDC Training Fund and obtain certification.  (Delgado Decl. ¶ 8(c).) Certification does not guarantee a laborer work as a shop steward, and the decision of whom to appoint shop steward is made by the Business Manager.  (*Id.*)

---

[4] Paragraph 8 of John Delgado's declaration contains two (c) subparts. The citation herein is to the first.
[5] Based on the transcript from Bynum's deposition, Kenny Brancaccio appears to have been employed by the Union as both a business agent and the assistant to the Business Manager.  (Bynum Dep. 154:21–154:25.)

4. <u>Plaintiffs' Allegations of Discriminatory Hiring Hall Abuses</u>

Although plaintiffs do not specifically identify claims arising out of separate practices, the allegations in the complaint and the scope of the proposed class logically ought to comprise of <u>two</u> distinct practices that plaintiffs believe constitute intentionally discriminatory treatment and/or have a disparate impact on minority union members. The first is the alleged practice of bypassing the out-of-work list. Essentially this claim alleges that instead of adhering to the Hiring Hall Rules which govern job referrals[6] and the maintenance of the out-of-work list, union officials pass out the best job referrals to favored "cronies." The second is the undisputed, discretionary method by which shop stewards are assigned.

*a. Bypassing the Out-of-Work List*

Plaintiffs contend that Local 79 union officials have a practice of bypassing the out-of-work list,[7] and alleges this practice constitutes intentional discrimination as part of an established pattern or practice of disparate treatment, as well has having a disparate impact on the union's minority membership. (TAC ¶ 100; *see generally* Bynum Dep.) According to plaintiffs, this practice of bypassing the out-of-work list occurs by "numerous means whereby a disfavored member can be denied the fair treatment that the job referral rules are designed to protect." (TAC ¶ 70.) Plaintiffs allege that union

---

[6] The "most attractive type of job" is identified in the complaint as "shop steward for a general contractor." (TAC ¶ 58.) As discussed in further detail elsewhere in this opinion, shop stewards are not appointed from the out-of-work list. Of the jobs that are referred from the out-of-work list, plaintiffs identify general contracting work to be the least physically demanding available to Local 79 laborers, while mason tender, scaffolding, and demolition are all physically demanding and dangerous. (*Id.* ¶¶ 59–62.) As one would expect, long-term jobs are considered more attractive than short-term jobs. (*See id.* ¶¶ 65–66.)

[7] Plaintiffs have not brought a breach of duty of fair representation claim against Local 79 for this alleged deviation from the Hiring Hall Rules. *See Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 75–76 (1989) (holding that an individual union member may bring a claim in federal court for breach of duty of fair representation against union for breach of hiring hall rules under the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151 et. seq.).

officials can ignore a member's ranking and send out a "favored member" in his place (*id.* ¶ 71), or union officials can find out from a contractor that a job opening will become available, and send a favored member without ever reporting the referral opportunity to the Hiring Hall (*id.* ¶ 72).  There is one example of this practice proffered in the third amended complaint.  Plaintiff Beverly Colon received a call in the Fall of 2001 from Denise Echevarria, then the Assistant to the Director of the Hiring Hall, and was told Colon was being referred as the first person on the out-of-work list to a "good, long-term" job.  (*Id.* ¶ 77.)  However, Colon could hear the Director of the Hiring Hall, William Schmidt, speaking to Echevarria in the background, and telling her to call Colon back.  (*Id.*)  Later that day, Colon was told that the long-term job went to "someone else" and was referred instead to a two-week job, after which she was unemployed.  (*Id.*)

The only deposition testimony submitted in support of plaintiffs' motion is that of named plaintiff James Bynum, a black male who has been a member of Local 79 since its inception.  (*Id.* ¶ 4.)  From 1996 to 2000, Bynum worked for Local 79 in various capacities including as Business Agent, Assistant to the Hiring Hall Director, and Director of the Grievance Department.  (*Id.*)  From 2000 to 2003, Bynum worked as a Local 79 shop steward on various jobs.  (*Id.*)  At his deposition, Bynum was unable to identify any *specific* examples when the Union bypassed the out-of-work list and referred work to an applicant out of turn.[8]  However, Bynum did testify generally that Local 79

---

[8]    Q:  Are you aware of any situation in which the Union ignored the list and skipped someone on the list who had made themselves available for a demo B in Staten Island or any location, and decided to assign it people lower on the list?

        A:  I wouldn't know if—I can't say personally because I don't know if people were on the list, so I really can't say that, but I have been on a job in situations where people came, showed up on the job site saying there were sent from the hall and they weren't all on the out of work list, but either business agents or you know, like I have been on a job site where I had two business agents sent I would say two of their buddies down.

Business Agents had bypassed the out-of-work list by giving jobs to union members who came into the office looking for an assignment.  There is no evidence in the record whether a disproportionate number of white union members sought job assignments in this manner.[9]  Again without describing specific examples, he also testified that most or all Local 79 Business Agents "at one point in time or another" obtained a favor and had a friend referred to a job.[10]

### b. *Shop Steward Appointment Practice*

Neither the complaint nor the memoranda submitted by plaintiffs in support of their motion to certify the proposed class specifically identify the Business Manager's subjective ability to appoint shop stewards as a basis for a disparate treatment and/or disparate impact claims.  However, plaintiffs' allegations in the complaint purporting to identify instances of the alleged practice of bypassing the out-of-work list predominantly complain that union "cronies" receive a disproportionate amount of available shop steward assignments, even though plaintiffs are eligible for shop steward appointments

---

(Bynum Dep. 68:19–69:09.)

[9] When asked about the alleged practice, Bynum answered as follows:

    A:  A lot of times, even though we had the out of work list, there was members coming in to the office and like I said, if they was like an immediate availability of a job or whatever, if it was something I have for you to go to right there and then, we give it to whoever walked in the door.  So did we bypass the list?  Millions of times, millions of ways.

    Q:  So is that in violation of hiring hall rules?

    A:  I would say so.  I know the man sitting on the list, sitting at home waiting for a phone call should have been offered that work.

(Bynum Dep. 150:07–150:19.)

[10]  Q:  [W]as there ever a time where you are in [William Schmidt's (former Director of the Hiring Hall)] office and you see him skip someone on the list to offer a good job to someone beneath that person on the list?

    A:  I have been in the office when business agents walked in and say my friend is out of work a long time, do me a favor, and say here, take this one. . . .

    Q:  What BAs did you ever see come in?

    A:  I basically say everyone did a favor once in a blue.  Everybody ever worked there. . . . A friend, this buddy of mine, do me a favor, you know, help my friend out.  He is in a jam or whatever the case may be.  I won't say it was normal, but basically every business agent done it at one point in time or another.

(Bynum Dep. 151:09–154:19.)

(or easily could be) and have informed the union that they are looking for work.[11]  (*See,
e.g.*, TAC ¶¶ 82–89 (alleging that Joseph Franco (a favored member) was a late applicant
to the out-of-work list, and then "bypassed [named plaintiffs] Harrison, Mitchell,
Flowers, Colon, Ingram, Hairston and Attenborough on the list" and was sent to a long-
term general contractor's job as a shop steward, where he earned over $125,000 per year
at that job); *id.* ¶¶ 90–91 (alleging that Peter Dinuzzo (an alleged union crony) applied to
the out-of-work list after named plaintiffs Colon, Flowers, Lewis, Harrison, and
Hairston[12] but was assigned as shop steward on a job ahead of aforementioned plaintiffs
"because they were not members of the nepotistic system"); *id.* ¶¶ 92–93 (alleging that
Joseph Chiappetti applied to the out-of-work list after named plaintiffs Colon, Harrison,
Bell, Mitchell, Flowers, Hairston[13] but was assigned as shop steward on a job in January
2002).)  While the foregoing allegations appear to have been offered in support of
plaintiffs' bypass claim, because a union member's position on the out-of-work list has
no bearing on his eligibility to be appointed to shop steward, these allegations do not in
fact support the plaintiffs' position that there is a practice of bypassing the list.  However,
it does appear that plaintiffs dispute the fairness of the shop steward appointments

---

[11] Based on these allegations, and assuming the accuracy and legitimacy of the Hiring Hall Rules, which we
have every reason to do, it appears plaintiffs misapprehend what would in fact constitute bypassing the list.
On the face of the Hiring Hall Rules, appointment of a later applicant on the out-of-work list to a shop
steward position does not in fact constitute a violation of the official hiring hall referral practices, but the
vast majority of specific allegations in the complaint identify appointments of "cronies" to shop steward
positions as examples of "bypassing" the out-of-work list.
[12] According to the October 29, 2002 out-of-work list annexed to the TAC as Exhibit 2, Colon, Flowers,
Lewis, Harrison, and Hairston were on the out-of-work list as numbers 2, 22, 107, 113, and 609
respectively.  Peter Dinuzzo was number 238 on the list, and had placed his name on the list on September
30, 2002, after all the aforementioned plaintiffs.  Dinuzzo's position at 238 ahead of Hairston at 609 is the
result of Dinuzzo's eligibility for the A List.  List B begins at position 551 on the list. (TAC Ex. 2.)
[13] According to the January 2, 2002 out-of-work list annexed to the TAC as Exhibit 3, Colon, Harrison,
Bell, Mitchell, Flowers, and Hairston, were on the out-of-work list as numbers 22, 155, 250, 313, 394, and
854 respectively.  Joseph Chiappetti was number 454 on the list, and had placed his name on the list on
December 28, 2001, after all aforementioned plaintiffs.  Chiappetti's position at 454 ahead of Hairston's
position at 854 is attributable to Chiappetti's eligibility for the A List.  List B begins at position 478 on the
list.  (TAC Ex. 3.)

procedure and that the disparate impact of which they complain may stem at least in part, if not entirely, from this practice.

Bynum testified in his deposition that the decision to appoint someone to the shop steward position has little to do with merit, and everything to do with "who you know." For example, Bynum attributes union member Mike Brennan's consistent employment to his perpetual assignment to shop steward positions by virtue of his friendship with John Brosnan (a business agent). (Bynum Dep. 217:08–218:14.)  When asked how he knew Brennan's appointments were not the result of an assessment of the quality of his work, Bynum answered, "Well, one, I know Mike is a little wino.  So definitely won't be nothing about the quality of his work.  You got friends in high places, people overlook things of that nature." (*Id.* at 218:14–218:22.)  Bynum also testified that Joe Giardino, Jr. benefited from his connections, and that he was consistently placed in steward positions. (*Id.* at 220:06–220:17.)  When asked what information he had that would lead him to believe that Giardino was not appointed to shop steward positions because of the quality of his work, Bynum responded:

> You know, it's funny when you ask that question, about what other
> information would I have other than this knowledge of his work.  I think
> it's—if we all take the same shop course, right, why would he be going
> out to work more than anybody else, if we all got the same certificate?  So
> that means we all took the same course, the same class, took the same little
> test.  Obviously in order for me to get a certificate, I had to pass.  For you
> to get one, you have to pass.  So what would make him such a super shop
> steward that he is never out of work other than having a chronie [sic]?

(*Id.* at 220:24–221:11.)  Furthermore, Bynum stated that Giardino did not even regularly show up at his shop steward jobs:  "Joey was not there every day.  Joey got paid when Joey wasn't around.  You got to remember, his uncle is one of the—I would say a real mobster.  Those are mobsters." (*Id.* at 222:08–222:11.)  Bynum also testified that union

members Joe Mastrione, Robert Sporano, and Nicholas Turel all have received steady work as shop stewards and have a disproportionate amount of hours despite being relative newcomers without prior experience in the industry, not on the basis of merit, but simply because they all have family connections to union officials. (*See id.* at 224:13–225:18 (Mastrione), 230:19–232:22 (Sporano), 234:21–235:24 (Turel).)

### c. *Alleged Discriminatory Result of Defendant's Referral Practices*

Plaintiffs allege that defendant's referral practices result in a dramatic salary disparity among minority versus nonminority union members. Specifically, plaintiffs assert that as a result of defendant's "nepotistic and cronyistic referral system," a significant percentage of minority Local 79 members struggle to earn $20,000 to $30,000 a year, while "favored members" who are beneficiaries of behind-the-scenes referrals can make between $125,000 and $150,000 a year. (TAC ¶ 65.) Furthermore, plaintiffs allege that union officials refer friends, neighbors and relatives to the most desirable jobs (long-term and less dangerous), while minorities are left with short-term, dangerous, and otherwise unattractive jobs. (*See id.* ¶¶ 37, 59–63, 99.) However, as previously noted, the TAC does not contain any specific allegations demonstrating that a later applicant had been given a referral opportunity from the out-of-work list ahead of plaintiffs. Instead, plaintiffs identify circumstances where later (or non) applicants on the out-of-work list, alleged to be "insiders" or relatives of union officials, were sent to job sites by the Business Manager to act as shop steward. (*Id.* ¶¶ 84–85, 91–95, 97–98.) As also previously noted, an applicant's position on the out-of-work list has no bearing on the selection of shop stewards.

### d.  Evidence Submitted in Support of Plaintiffs' Motion

In addition to the above-cited allegations in the Third Amended Complaint and the deposition testimony of James Bynum, plaintiffs submit the following evidence to support their motion: (1) a 1993 report entitled "Building Barriers, Discrimination in New York City's Construction Trades," issued by the New York City Commission on Human Rights ("NYCCHR Report") (Pls.' Ex. 2), (2) an Agreement and Consent Decree dated February 13, 1995 between LIUNA and the United States Department of Justice ("LIUNA-DOJ Consent Decree") (Pls.' Ex. 3); (3) excerpts from New York State Organized Crime Task Force, *Corruption and Racketeering in the New York City Construction Industry:  Final Report to Governor Mario M. Cuomo* (1990) ("NYSOCTF Report") (Pls.' Ex. 4); (4) the transcript from a September 7, 2004 supervisory hearing in *In the Matter of Local Union 79*, before an independent hearing officer ("Supervisory Hearing Transcript") (Pls.' Ex. 7); (5) the voluntary supervision agreement entered into between LIUNA and Local 79 on July 20, 2004 ("LIUNA–Local 79 Supervision Agreement") (Pls.' Ex. 7); (6) a report of an interview of Daniel Kearney ("Kearney Interview") (Pls.' Ex. 7); (7) the transcript from the June 22, 2004 plea allocution in the matter *United States v. Kearney*, 04 Cr. 322 (JES) (RLE) (S.D.N.Y., filed Apr. 7, 2004) ("Kearny Plea") (Pls.' Ex. 7); (8) an information filed in the matter *United States v. Garafola*, 04 Cr. 732 (S-2) (DGT) (E.D.N.Y.) ("Garafola Information") (Pls.' Ex. 8); (9) a plea sheet for Junior Campbell ("Campbell Plea") (Pls.' Ex. 8); (10) excerpts of defendant's Form LM-2 Labor Organization Annual Reports submitted to the United States Department of Labor, Employment Standards Administration (Pls.' Ex. 8); and (11) an article discussing the Campbell and Garafola matters, John Marzulli, *Say Mob*

*Bilked MTA of $10M*, Daily News, Sept. 16, 2004 (Pls.' Ex. 8).  With the exception of the

NYCCHR Report, which does address the issue of discrimination, all of the foregoing

exhibits are submitted in support of plaintiffs' argument that discrimination against

minorities may be inferred from corrupt conduct practiced by individual Local 79

officials, the union and its predecessors, and the New York City construction industry as

a whole.  (*See* Pls.' Supp. Mem. 3–6.)

## DISCUSSION

1. <u>Standard</u>

A district court's analysis of a motion for class certification generally proceeds in

two steps, both of which are governed by Rule 23.  Fed. R. Civ. P. 23.  In *General*

*Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982), the Supreme Court stated

that a "Title VII class action, like any other class action, may only be certified if the trial

court is satisfied after a *rigorous analysis*, that the prerequisites of [Federal Rule of Civil

Procedure] 23(a) have been satisfied."  *Id.* at 161 (emphasis added).  Rule 23(a) provides:

> (a) Prerequisites to a Class Action. One or more members of a class may
> sue or be sued as representative parties on behalf of all only if (1) the class
> is so numerous that joinder of all members is impracticable, (2) there are
> questions of law or fact common to the class, (3) the claims or defenses of
> the representative parties are typical of the claims or defenses of the class,
> and (4) the representative parties will fairly and adequately protect the
> interests of the class.

Fed. R. Civ. P. 23(a).  These requirements are frequently referred to as numerosity,

commonality, typicality, and adequacy of representation, respectively.  *See Falcon*, 457

U.S. at 156.

If a court determines that the Rule 23(a) requirements have been met, it must then

decide whether the class is maintainable pursuant to one of the subsections of Rule 23(b),

16

which govern, *inter alia*, the form of available relief and the rights of absent class

members.  In this case, plaintiffs urge the Court to certify a class under either subsection

(2) or (3) of Rule 23(b), which provides, in part:

> (b)  Class Actions Maintainable.  An action may be maintained as a class
> action if the prerequisites of subdivision (a) are satisfied, and in addition:
> . . .
> (2) the party opposing the class has acted or refused to act on grounds
> generally applicable to the class, thereby making appropriate final
> injunctive relief or corresponding declaratory relief with respect to the
> class as a whole; or
> (3) the court finds that the questions of law or fact common to the
> members of the class predominate over any questions affecting only
> individual members, and that a class action is superior to other available
> methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b).

District courts are "afforded substantial leeway in deciding issues of class

certification," *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 162 (2d Cir.

2001), and it is proper "to view a class action liberally in the early stages of litigation,

since the class can always be modified or subdivided as issues are refined for trial," *Woe*

*v. Cuomo*, 729 F.2d 96, 107 (2d Cir. 1984); *see* Fed. R. Civ. P. 23(c)(1);[14] *Falcon*, 457

U.S. at 160 ("Even after a certification order is entered, the judge remains free to modify

it in light of subsequent developments in the litigation.").  When considering the

propriety of certification, a court assumes the truth of the allegations in the pleadings.

*Shelter Realty Corp. v. Allied Maint. Corp.*, 574 F.2d 656, 661 n.15 (2d Cir. 1978);

*DeAllaume v. Perales*, 110 F.R.D. 299, 305 (S.D.N.Y. 1986) ("[F]or purposes of

determining class certification issues, the allegations are taken as true and the merits of

the complaint are not examined.").

---

[14]  Federal Rule 23(c)(1) provides in relevant part: "An order under this subdivision may be conditional,
and may be altered or amended before the decision on the merits."  Fed. R. Civ. P. 23(c)(1).

Although plaintiffs are not required to make an extensive evidentiary showing, *Follette v. Vitanza*, 658 F. Supp. 492, 505 (N.D.N.Y. 1987), *vacated in part on other grounds*, 671 F. Supp. 1362 (N.D.N.Y. 1987), they do carry the ultimate burden of establishing that the requirements of Rule 23 have been met, *Caridad v. Metro-North Commuter R .R.*, 191 F.3d 283, 291 (2d Cir. 1999).  The decision to certify a class is not an "occasion for examination of the merits of the case," *In re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d 124, 135 (2d Cir. 2001); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78 (1974), but district courts are required to look past the pleadings for the limited purpose of deciding if the Rule 23 requirements have been met, although that determination neither requires nor invites resolution of disputed issues of fact, *see, e.g.*, *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 231 (2d Cir. 2006) ("'[I]n making a certification decision, a judge must look somewhere 'between the pleadings and the fruits of discovery. . . . Enough must be laid bare to let the judge survey the factual scene on a kind of sketchy relief map, leaving for later view the myriad of details that cover the terrain.'") (quoting *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 571–72 (2d Cir. 1982)); *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 186–89 (2d Cir. 2001) (holding that it is "not only . . . appropriate, but also necessary" to look past the pleadings when deciding whether to certify a class).  *But see Caridad*, 191 F.3d at 292 (noting that class plaintiffs "need not demonstrate at [the class certification] stage that they will prevail on the merits").

With these principles in mind, the Court turns to the Rule 23 analysis.

2. <u>Numerosity</u>

The purpose of the numerosity requirement is to promote judicial economy by avoiding a multiplicity of actions. *See, e.g.*, *Robidoux v. Celani*, 987 F.2d 931, 935–36 (2d Cir. 1993). Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Impracticability means difficulty or inconvenience of joinder [not] . . . impossibility of joinder," *In re Blech Sec. Litig.*, 187 F.R.D. 97, 103 (S.D.N.Y. 1999) (citation omitted), and the Second Circuit has observed that "numerosity is presumed at a level of 40 members." *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.), *cert. denied*, 515 U.S. 1122 (1995) (citing 1 *Newberg on Class Actions 2d* § 3.05 (1985)); *see also Presbyterian Church v. Talisman Energy, Inc.*, 226 F.R.D. 456, 466 (S.D.N.Y. 2005) ("Numerosity is presumed when a class consists of forty or more members."). Plaintiffs are not obligated to identify the exact number of class plaintiffs, *see Robidoux v. Celani*, 987 F.3d 931, 935 (2d Cir. 1993), and "courts may 'make common sense assumptions' to support a finding of numerosity," *Weissman v. ABC Fin. Servs., Inc.*, 203 F.R.D. 81, 84 (E.D.N.Y. 2001) (quoting *Percere v. Empire Blue Cross & Blue Shield*, 194 F.R.D. 66, 69 (E.D.N.Y. 2000)).

Here, the proposed class is defined as all minority members of Local 79 who maintained their name on the out-of-work list, and all minority members of Local 79 who had shop steward certification or were eligible to obtain such certification. Plaintiffs allege, and defendant does not dispute, that Local 79 has a membership of approximately 7500, and that the majority of that membership are Black or Hispanic. (TAC ¶¶ 31–32; Delgado Dep. ¶¶ 3, 11.) The out-of-work lists appended to the Third Amended

Complaint show that the number of members on the list are consistently well over 1000, and the Court can safely presume that more than forty of the persons on the list are minorities.  (*See* TAC Exs. 1–4.)

According to the allegations in the third amended complaint, twelve of the named plaintiffs maintained shop steward certification, and defendant submitted the declarations of eighteen minority union members who state that they have received appointments to the shop steward position.  (*See* Declarations of Twenty Putative Class Members in Opp'n to Pls.' Motion for Class Certification 1–13, 15–16.)  Furthermore, any union member is *eligible* at any time to obtain shop steward certification.

While plaintiffs do not submit evidence indicating the precise number of minority union members who have maintained their name on the out-of-work list, or who maintain shop steward certification, in light of the foregoing the Court may presume that, should the other requirements of Rule 23(a) be met, the numerosity requirement will be met with respect to both groups comprising the proposed class.

3. <u>Commonality and Typicality</u>

"'The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact.'"  *Robinson*, 257 F.3d at 155 (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (per curiam)).  This requirement is not quantitative in nature; that is, it is possible to satisfy Rule 23(a)(2) where only a single issue is common to the members of the proposed class, as long as resolution of that issue will advance the litigation.  *Savino v. Computer Credit, Inc.*, 173 F.R.D. 346, 352 (E.D.N.Y. 1997), *aff'd*, 164 F.3d 81 (2d Cir. 1998).  In discrimination cases commonality does not mandate that all class members make identical claims and arguments, but requires that "the gravamen

of the [c]omplaint is that defendants discriminated against class members in the same general fashion." *Open Hous. Ctr., Inc. v. Samson Mgmt. Corp.*, 152 F.R.D. 472, 476 (S.D.N.Y. 1993).

Rule 23(a)(3) "requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A.*, 126 F.3d at 376. The typicality criterion does *not* require that the "factual predicate of each claim be identical to that of all class members"; rather, it "requires that the disputed issue of law or fact 'occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class.'" *Caridad*, 191 F.3d at 293 (quoting *Krueger v. New York Telephone Co.*, 163 F.R.D. 433, 442 (S.D.N.Y. 1995)).

> As noted by the Supreme Court in *Falcon*,
>
> The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.

457 U.S. at 157 n.13. Therefore the Court will consider whether plaintiffs have met the commonality and typicality requirements here in tandem.

A threshold issue in this case is what evidentiary showing is necessary in a pattern-or-practice or disparate impact case to support a finding of commonality or typicality. In *Falcon*, the Supreme Court addressed the necessity of proving the existence of an aggrieved class in order to satisfy Rule 23(a)'s requirements:

> Conceptually, there is a wide gap between (a) an individual's claim that he
> has been denied a promotion on discriminatory grounds, and his otherwise
> unsupported allegation that the company has a policy of discrimination,
> and (b) the existence of a class of persons who have suffered the same
> injury as that individual, such that the individual's claim and the class
> claims will share common questions of law or fact that the individual's
> claim will be typical of the class claims.  For [a plaintiff] to bridge that
> gap, he must prove much more than the validity of his own claim.

*Id.* at 157–58.  While the *Falcon* Court held that individualized allegations of specific

discriminatory treatment would not be sufficient to support a showing of a class-wide

claim, it did indicate that "[s]ignificant proof that an employer operated under a general

policy of discrimination conceivably could justify a class of both applicants and

employees if the discrimination manifested itself in hiring and promotion practices in the

same general fashion, such as through entirely subjective decisionmaking processes."  *Id.*

at 159 n.15; *see also Caridad*, 191 F.3d at 292 (affirming certification of a company-wide

class where role of subjective assessment was difficult to assess but plaintiffs had shown

"significant statistical disparities" "sufficient to demonstrate common questions of fact

regarding the discriminatory implementation and effects of Metro-North's company-wide

policies regarding promotion and discipline").

　　Following *Falcon*, courts in this and other Circuits have required that plaintiffs

produce some quantum of evidence to satisfy the commonality and typicality

requirements, usually in the form of affidavits, statistical evidence, or both, tending to

show the existence of a class of persons affected by a company-wide policy or practice of

discrimination.  In *Caridad*, the Second Circuit stated:  "Of course, class certification

would not be warranted absent *some showing* that the challenged practice is causally

related to a pattern of disparate treatment or has a disparate impact on African-American

employees at Metro-North."  191 F.3d at 292 (emphasis added) (finding commonality

and typicality requirements met based on plaintiffs' proffered statistical report and anecdotal evidence, although without any inquiry into the ultimate persuasiveness of plaintiffs' evidence).  *See, e.g.*, *Sheehan v. Purolator, Inc.*, 839 F.2d 99, 102 (2d Cir. 1988) (affirming district court's "denial of class certification on the ground of lack of class-wide proof of an aggrieved class," where plaintiffs' one affidavit and statistics on (1) the number of employees who complained of discrimination, (2) the relative number of men and women at various job titles, and (3) the salaries/fringe benefits received by male and female employees were insufficient evidence of an aggrieved class); *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 596 (2d Cir. 1986) (affirming district court's holding that plaintiff had "failed to prove the existence of any class of employees suffering from such discrimination"); *Hnot v. Willis Group Holdings Ltd.*, 228 F.R.D. 476, 484 (S.D.N.Y. 2005) (noting that "[c]lass certification may be based on statistical evidence alone," and that courts, in their discretion, may "require or rely on anecdotal evidence, but they commonly do so where the statistical evidence is weak"); *Cokely v. N.Y. Convention Ctr. Operating Corp.* ("*Cokely I*"), 2003 WL 1751738, at *2–*3 (S.D.N.Y. Apr. 2, 2003) (denying without prejudice plaintiffs' motion to certify class because of failure to meet evidentiary burden necessary to conduct "rigorous analysis" required under *Falcon*, where plaintiffs submitted a single affidavit and no statistical data); *Ross v. Nikko Secs. Co. Int'l, Inc.*, 1990 WL 121678, *6 (S.D.N.Y. Aug. 10, 1990) (finding that plaintiffs' deposition testimony and non-class members' affidavits offered as "evidence of disparate treatment to be insufficiently probative of the existence of an aggrieved class to permit certification"); *Reap v. Cont'l Cas. Co.*, 199 F.R.D. 536, 544 (D.N.J. 2001) (noting that a plaintiff is required to produce evidence in form of affidavits

and/or statistical evidence that tends to show the individual claims share questions of law or fact with the class claims and that the individual claims are typical of those brought on behalf of the class) (citing *Churchill v. IBM*, 759 F. Supp. 1089, 1101 (D.N.J. 1991); *Zapata v. IBP, Inc.*, 167 F.R.D. 147, 158 (D. Kan. 1996)); *Reid v. Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655 (D. Ga. 2001) (denying certification of class where plaintiffs failed to present evidence tending to show that class members were subject to uniform employment practices affecting all the employer's facilities in the same way).

      a. *Plaintiffs' Showing of Commonality and Typicality with Respect to Claims Arising Out of Defendant's Alleged Practice of Bypassing the Out-of-Work List is Insufficient*

As discussed earlier, plaintiffs' first contention in this case is that defendant routinely ignores the rules governing the Hiring Hall and fails to refer jobs on the first in, first out basis as required under the Hiring Hall Rules (subject to the exceptions described *supra*). Instead, plaintiffs allege, as the best jobs come into the Hiring Hall, union officials pass them along to "favored member[s]." (*See* TAC ¶ 71.) Such an alleged practice may indeed form the basis for pattern-or-practice discrimination claim,[15] or a disparate impact claim,[16] *Caridad*, 191 F.3d at 292, and in either case, in order to certify

---

[15] "In a pattern or practice class action, the initial focus is in proving an [employer]-wide intentional discriminatory practice or policy, not individual incidents of discrimination. In consequence, 'statistical evidence constitutes the core of plaintiffs' prima facie case of intentional pattern-or-practice discrimination.' Once plaintiffs in such a case succeed in proving the alleged discriminatory practice or policy, the class obtains injunctive relief, and individual class members who seek individualized relief enjoy a presumption that employment actions of which they complain were affected, thus shifting the burden of proof to the defense." *Latino Officers Ass'n, Inc. v. City of New York*, 2006 WL 238989, at *1 (S.D.N.Y. Jan. 31, 2006) (citing *Robinson*, 267 F.3d at 158 n.5). Cases involving the types of wrongdoing implicitly alleged in this action have been found to make a prima facie case of intentional pattern-or-practice discrimination. *See, e.g.*, *Pennsylvania v. Local Union 542, Int'l Union of Operating Engineers*, 469 F. Supp. 329 (E.D. Pa. 1978), *decision supplemented*, 502 F. Supp. 7 (E.D. Pa. 1979), *decision supplemented*, 488 F Supp. 988 (E.D. Pa. 1979), *aff'd*, 648 F.2d 922 (3d Cir. 1981) (finding that proof of gross statistical disparities, nonstatistical proof showing specifically enumerated departures from hiring hall practices, and testimony of minority individuals regarding their attempts to seek access to hiring hall may create or corroborate inference of employment discrimination).

[16] Disparate impact claims do not require proof of discriminatory intent, because "disparate impact theory targets practices that are fair in form, but discriminatory in operation." *Smith v. Xerox Corp.*, 196 F.3d 358,

a class plaintiffs must make "*some showing* that the challenged practice is *causally related* to a pattern of disparate treatment or has a disparate impact" on the putative class, *id.* (emphasis added).

Here, even on the face of the complaint there are no allegations that the result of the alleged bypassing practice is that white union members lower on the out-of-work list are referred to "desirable" jobs ahead of minority union members.  In fact, rather than alleging that *white* union members receive job referrals in lieu of plaintiffs, the complaint instead solely alleges that "*favored members*," or "numerous individuals," are the beneficiaries of defendant's "cronyistic and nepotistic" practice.  (*See* TAC ¶¶ 64, 71, 105.)  In the sole specific example proffered, with respect to Beverly Colon, there is no allegation that the "someone else" who received the long-term work assignment instead of Colon was in fact a nonminority, or, for that matter, a later applicant to the list. (TAC ¶ 77.)[17]  The absence of allegations that even one of the named plaintiffs has lost a long-term desirable job given to a nonminority applicant lower on the out-of-work list precludes a finding of typicality.

Furthermore, unlike *Caridad*, 191 F.3d 283, *Robinson*, 267 F.3d 147, and *Latino Officers' Ass'n*, 209 F.R.D. 79, the cases upon which plaintiffs primarily rely, in this case no statistical evidence has been offered to establish commonality.  And while a statistical

---

364 (2d Cir. 1999) (internal quotation marks and citation omitted).  "To make out a prima facie case of disparate impact, a plaintiff must (1) identify a policy or practice, (2) demonstrate that a disparity exists, and (3) establish a causal relationship between the two."  *Malave v. Potter*, 320 F.3d 321, 325 (2d Cir. 2003) (internal quotation marks omitted).  The plaintiff may submit statistical data to show a disparity in outcome between groups, but to establish a prima facie case "the statistical disparity must be sufficiently substantial to raise an inference of causation."  *Id.* (internal quotation marks omitted).

[17] In addition, the complaint does not demonstrate that the union officials in a position to bypass the list are in fact white, which might give rise to an inference that the favored members are also white.  *See Shipes v. Trinity Indus.*, 987 F.2d 311, 316 (5th Cir. 1993) (affirming district court's certification of class in a pattern-or-practice discrimination case based on, *inter alia*, evidence that white supervisors at separate plants applied subjective criteria in making personnel decisions). Instead, the complaint generally alleges that "Historically, Local 79 and its predecessors have been controlled by white, non-minorities; there is a history and practice of discriminating against minorities."  (TAC ¶ 35.)

showing is not the only way to establish the existence of an aggrieved class, only the

sworn testimony of one named plaintiff, James Bynum, has been offered to support the

alleged existence of a behind-the-scenes referral practice that circumvents the out-of-

work list.  But Bynum's testimony that the out-of-work list was bypassed because union

members who came to the office looking for work were routinely given jobs (Bynum

Dep. 150:07–150:19) does not show an aggrieved class, at least in the absence of

evidence that a disproportionate number of white workers sought a job assignment in this

manner.  Nor does the testimony that business agents "once in a blue [moon]" would

request an assignment for a friend (*id.* at 151:09–154:19), at least in the absence of

evidence of the race of business agents and the frequency of occurrence, sufficiently

establish an aggrieved class.[18]  Even assuming the existence of the alleged practice, as is

appropriate at the class certification stage, plaintiffs have proffered no evidence of the

disparate impact suffered by the putative class members as a result of this practice, let

---

[18] While weighing the evidence at this stage is clearly unwarranted, the sufficiency of plaintiffs' evidence
on its face is relevant to determining whether the requirements of class certification have been met.  To this
end, it is worth noting that Bynum's testimony, in its totality, does not provide compelling evidence that the
alleged practice of bypassing the out-of-work list in contravention of the Hiring Hall Rules in fact occurs.
For one, it appears that Bynum considers the administration of the out-of-work list to be unfair, even when
administered in precise accordance with the Hiring Hall Rules.  He considers the tier organization of the list
to be "crap," and thought the referral system ought to have remained "first come, first serve."  (Bynum
Dep. 29:06–29:23.)  He believes the union "figured they had to structure it to it was where they pacified
longer term members or whatever the case may be." (*Id.* at 29:18–29:20.)  Bynum further considers
*complying* with the Hiring Hall Rules in certain circumstances to constitute "screwing over" laborers on the
out-of-work list.  Specifically, Bynum cites as an example of the union's "dirty work" the following
scenario: when a short-term job comes in to the Hiring Hall for referral, the union will refer that job to the
next person on the out-of-work list, even when that person will fill their fifteen-day cumulative
employment quota as a result (thereby getting bumped back to the bottom of the list).  (*See id.* at 144:01–
144:25, 147:01–147:25, 149:02–149:20.)  According to an objective reading of the Hiring Hall Rules,
however, this is the appropriate procedure, and the fact that the referral will cause someone who has been
out of work for an extended period to be returned to the bottom of the list at the close of the job is not a
basis for deviating from the first in, first out policy. (*See generally* Hiring Hall Rules; *supra* discussion of
how the out-of-work list operates.)  In short, much of the time that Bynum purports to testify to the alleged
bypassing practice, it is not clear he actually is referring to any breach of the Hiring Hall Rules.  Finally, a
significant detail lacking from Bynum's deposition is any testimony as to the race of the "friends" and
"buddies" who are the beneficiaries of the Hiring Hall's favoritism, or the race of those union officials
passing out favors, which might raise some inference that the beneficiaries are of the same race.

alone evidence to support a conclusion that a some causal connection exists between the alleged practice and alleged effect.

According to this Court's survey of the case law, the overwhelming majority of Title VII class actions certified in this Circuit include submissions of "some evidence" tending to establish that the proposed class was likely to be paid less, to be promoted less frequently, to be disciplined more frequently, or to be fired more frequently, than their nonminority, male, or younger counterparts, in support of a showing of commonality. *See, e.g.*, *Caridad*, 191 F.3d at 292–93 (concluding that plaintiffs' statistical evidence, proffered to show (1) that African-Americans are more likely to be disciplined than whites, and (2) that being Black has a statistically significant effect on an employee's likelihood of being promoted, supported a finding of commonality); *Hnot*, 228 F.R.D. at 483 ("Plaintiffs' statistical reports also support a finding of commonality.  [The expert]'s reports show significant disparities in promotion and compensation between high-level women and men at Willis."); *Cokely v. New York Convention Ctr. Operating Corp.* ("*Cokely II*"), 2004 WL 1152531, at *2 (S.D.N.Y. May 21, 2004) (finding, in plaintiffs' renewed motion for class certification, that commonality and typicality requirements were met, where plaintiffs' submitted, *inter alia*, statistics purporting to demonstrate that the minority plaintiffs were paid less than their white counterparts); *Latino Officers Ass'n*, 209 F.R.D. at 89 ("The statistics submitted by the plaintiffs, regardless of their ultimate persuasiveness, are sufficient to demonstrate common questions of fact because it tends to establish that being Latino or African American has an effect on an officer's involvement and treatment in the NYPD's disciplinary system."); *Krueger v. New York Tel. Co.*, 163 F.R.D. 433, 439–40 (finding commonality requirement satisfied where

plaintiffs proffered "substantial evidence" in the form of, *inter alia*, a statistical analysis concluding that "workers over the age of 40 experienced a statistically significant greater probability of being put at risk of layoff and of being involuntarily terminated than younger workers"); *Bishop*, 141 F.R.D at 238 (finding commonality where plaintiffs provide statistical and anecdotal evidence supporting the allegations in the complaint; namely, that promoted employees are disproportionately white); *Warren v. Xerox Corp.*, 2004 WL 1562884, at *10 (E.D.N.Y. Jan. 26, 2004) (M.J. Mann) ("[C]onsistent with the decisions in *Robinson*, *Caridad*, and *Latino Officers*, where, as here, plaintiffs' statistical and anecdotal evidence tends to show that being a member of a racial minority has a negative effect on compensation, that showing suffices to demonstrate a common question of fact concerning defendant's employment practices, within the meaning of Rule 23(a).").

Going beyond the pleadings, as the Court must do in deciding whether to certify a class, plaintiffs submit <u>nothing</u> in support of their allegation that minority members of Local 79 work fewer hours, earn less money, and receive predominantly short-term, dangerous and otherwise less desirable jobs than similarly situated whites. *Cf. Cokely II*, 2004 WL 1152531, at *2 (S.D.N.Y. May 21, 2004) (granting plaintiffs' renewed motion to certify class based on plaintiffs submission of, *inter alia*, (1) affidavits of fourteen putative class members testifying to discrimination within the defendant-employer's job assignment and seniority systems; (2) affidavits of nonclass member employees testifying to existence of pervasive and overt racism in the workplace and that they suffered retaliation for complaining about it; (3) union grievance forms alleging discrimination and harassment and letters detailing same; (4) verified complaints filed with the New

York State Division of Human Rights detailing same; (5) complaints filed with EEOC; (6) table demonstrating how often certain employees are called for work and how much money they have earned and identifying those employees by race; and (7) statistics purporting to demonstrate that minority plaintiffs are paid less than white employees).

As outlined above, plaintiffs do submit a number of exhibits in support of their position that the history of discrimination and corruption in the construction industry and misfeasance by individual union officials supports a finding that there are questions of law and fact common to the class that the individual claims are typical of class-wide claims.  It is true, as noted by the court in *Cokely I*, that

> [j]udges sitting and living in New York City can take judicial notice of the fact that discrimination based on race, nationality and gender have been endemic in the construction industry over the past several decades. Nevertheless, a generalized awareness of discrimination is not sufficient to find common issues specific to a proposed class.

2003 WL 1751738, at *3 n.3 (internal citations omitted).  Moreover, even if such evidence were sufficient to demonstrate commonality in certain cases, plaintiffs' submissions do little to support the inference that minority members of Local 79 are the intentional or unintentional victims of discrimination.

The sole exhibit addressing the issue of discrimination is the NYCCHR Report , which includes very limited excerpts detailing the results of a 1993 investigation into the historic practice of race, ethnic, and gender discrimination within New York City's construction industry.  (NYCCHR Report 1.)  However, these brief excerpts do very little to give rise to the inference plaintiffs invite.  Indeed, a major problem identified in the Report is the overrepresentation of minorities and women in the unskilled laborer trades (such as those presently organized under Local 79), as opposed to the better-paid skilled

mechanical trades.  (*Id.* at 50, 52.)  The study does not appear to make any finding that discrimination exists within the subsection of the construction industry encompassing the types of construction work at issue in this action.  This certainly does not preclude a finding that such discrimination in fact does exist, but it does not raise an inference to that effect either.

Plaintiffs' other submissions similarly fail to raise any inference that union officials have a practice of bypassing the out-of-work list in favor of their friends and relatives.  Nor do these submissions tend to show that the putative class of minority union members work less hours and earn less money at less desirable jobs than their white counterparts.

The LIUNA-DOJ Consent Decree and the NYSOCTE Report relate to the role of corruption and racketeering in the construction industry, not to discrimination.  Specifically the LIUNA-DOJ Consent Decree was the resolution of a criminal prosecution brought to eliminate the corrupting influence of the organized crime syndicate La Cosa Nostra.  (LIUNA-DOJ Consent Decree 3–4.)  As a result of the Consent Decree, LIUNA agreed to adopt job referral rules and procedures which are the basis for the Hiring Hall Rules which presently govern Local 79.  (*Id.* at 8–9; *see also generally* Union Const.; Hiring Hall Rules.)  While the NYSOCTE Report does discuss the potential for abuse in the hiring hall, it is in the context of union abuse of the hiring hall mechanism to control dissent among union members, as opposed to exploring its tendency to be abused for the purpose (or with the effect) of favoring whites over minorities.  (NYSOCTE Report 52.)

The Supervisory Hearing Transcript, LIUNA–Local 79 Supervision Agreement, Kearney Interview, and Kearney Plea all pertain to Local 79's former secretary-treasurer, Daniel Kearney, who was prosecuted for embezzling union funds in 2003. (*See* Kearney Plea 3.) The Garafola Information, Campbell Plea, and Marzulli Article all relate to a prosecution arising out of a scheme to defraud the New York City Metropolitan Transportation Authority that involved the Gambino crime family and Junior Campbell, a business agent for Local 79. While these exhibits do establish that the illegal conduct of Local 79 officials has been the subject of prosecution, they do not tend to establish plaintiffs' allegations of discrimination or disparate impact.

      b. *Plaintiffs' Showing of Commonality and Typicality with Respect to Claims Relating to Defendant's Shop Steward Appointment Procedure is Also Insufficient*

As noted above, the allegations in the complaint, taken together and read liberally, lead the Court to draw the conclusion that plaintiffs intend to claim that defendant's shop steward appointment procedure also violates Title VII. Thus, to the extent plaintiffs seek to certify a class including "all minority members of Local 79 who at any time relevant to this action had a shop steward certification from Local 79 or were eligible to obtain a shop steward certification from Local 79," the Court understands plaintiffs' claim to be that the discretionary method by which the Business Manager appoints shop stewards constitutes a pattern or practice of disparate treatment or results in disparate impact on a protected class. Such claims are susceptible to class treatment, and ultimate relief under Title VII. *See, e.g.*, *Ingram v. Madison Square Garden Ctr, Inc.*, 482 F. Supp. 414, 424 (S.D.N.Y. 1979) (concluding, after trial in class action, that "Local 3's standardless and for the most part implicit policy of limiting referrals largely to personal friends of

31

acquaintances of its business agent . . . clearly operated to exclude the minority

employees who make up the plaintiff classes" in violation of Title VII); *see also United

States v. Local No. 357 of Int'l Bhd. of Elec. Workers, AFL-CIO*, 356 F. Supp. 104 (D.

Nev. 1972) (stating in case brought by United States that it is "unlawful for virtually all-

white unions and apprenticeship committees to give preference to relatives of union

members and union contractors in admission to training program or work referral since

such a preference operates to restrict the employment opportunities of [minorities]").

However, aside from the fact that plaintiffs fail to expressly identify the discretionary

shop steward appointment procedure as a basis for a cause of action, the complaint does

not contain fact allegations that, if true, would establish that appointed shop stewards are

disproportionately white.  Plaintiffs have not made any showing—statistical, anecdotal,

or otherwise—that minority union members obtain such appointments less frequently

than their white counterparts.  Absent such a showing, plaintiffs cannot met their burden

of showing that there common questions of law or fact to support the certification of a

class.

    c. *Plaintiffs' Failure to Produce Statistical Evidence*

    According to plaintiffs, in response to discovery requests defendant has taken the

position that it does not have statistical or other information about the racial composition

of its membership.  (*See* Letter from Nathaniel B. Smith, Counsel for Plaintiffs, to

Magistrate Judge Theodore H. Katz (Oct. 21, 2005).)  Plaintiffs' have complained that

they have been unable to compile the necessary statistical evidence to support their

motion, *inter alia*, because of defendant's failure to prepare and file with the Equal

Opportunity Commission certain reports ("EEO-3 Reports") detailing the racial

composition of its membership.  At the hearing on the present motion, counsel for defendant stated that it was the union's position that it was not required to file such reports but that it "may file something this year."  (Mar. 28, 2006 Tr. 13.)  Plaintiffs previously applied to Magistrate Judge Katz to compel the production of EEO-3 Reports, which Judge Katz denied.  (*See* Endorsed Letter from Nathaniel B. Smith, Counsel for Plaintiffs, to Magistrate Judge Theodore H. Katz (Oct. 21, 2005).)  Upon plaintiffs' motion to sustain their objections to the order entered by Judge Katz [61], this Court denied the motion, because neither the relied-upon regulation, 29 C.F.R. § 1602.24, nor applicable discovery rules authorizes a district court to require a union to prepare and file EEO-3 Reports upon the request of a private litigant.  Whether such reports must be prepared is an issue that must be resolved by the EEOC.  (Mar. 29, 2006 Order [65].)

While there may be some evidentiary impact at trial arising out of defendant's failure to maintain any required records, plaintiffs are not excused of their obligation, discussed at length above, to proffer evidence giving rise to an inference of discrimination on a class-wide basis in support of their class certification motion.  Such information, both statistical and anecdotal, should be obtainable through means other than the nonexistent EEO-3 Reports.  Plaintiffs are hereby given leave to conduct additional discovery, by December 31, 2006, on the issues of commonality and typicality and, thereafter, to file a renewed motion to certify a class within thirty (30) days of the close of discovery.

### 4.   Adequacy of Representation

The Rule 23(a)(4) test for adequacy has undergone recent changes.  The test originally encompassed two determinations, both that (i) the proposed class

representatives have no conflicts of interest with other members of the class; and (ii) that the representatives' class counsel be well qualified, experienced and capable of handling the litigation in question. *In re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d at 142. However, the Advisory Committee Notes to the 2003 Amendments to Federal Rule 23(g), effective December 1, 2003, state that "Rule 23(a)(4) will continue to call for scrutiny of the proposed class representative, while [Rule 23(g)] will guide the court in assessing proposed class counsel as part of the certification decision." Fed. R. Civ. P. 23(g). Thus, because Rule 23(a)(4) no longer governs the selection of class counsel, the Court will only address the adequacy of the proposed class representatives in this section.

Although "a court must be wary of a defendant's efforts to defeat representation of a class [on] grounds of inadequacy when the effect may be to eliminate any class representation," *Kline v. Wolf*, 702 F.2d 400, 402–03 (2d Cir. 1983), courts should "carefully scrutinize the adequacy of representation in all class actions." *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2d Cir. 1968). That scrutiny is generally directed to three areas. First, courts should consider whether the proposed plaintiffs are credible. *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 549 (1949) (class representative is a fiduciary, and interests of the class are "dependent upon his diligence, wisdom and integrity"); *Kaplan v. Pomerantz*, 132 F.R.D. 504, 510 (N.D. Ill. 1990) ("[a] plaintiff with credibility problems . . . does have interests antagonistic to the class.") (internal quotation marks omitted). Second, courts should consider whether the proposed plaintiffs have adequate knowledge of the case and are actively involved. *Baffa*, 222 F.3d 52, 61 (2d Cir. 2000) (recognizing knowledge as a factor to consider in determining class certification but noting that it is properly considered in connection with the

"typicality" requirement of Rule 23(a)(3)).  Finally, they should consider whether the interests of the proposed plaintiffs are in conflict with those of the rest of the class. *Epifano v. Boardroom Business Prods., Inc.*, 130 F.R.D. 295, 300 (S.D.N.Y. 1990) (noting that where defendants have claims for contribution against potential class representatives, their interests might conflict with those of the class).

As noted in *Falcon*, the typicality and commonality requirements not only merge as between themselves, but "also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about . . . conflicts of interest."  457 U.S. at 157 n.13.  This is because "[t]he more similar the claims and defenses of the class and its representatives, the more likely the representative will champion the interests of the class."  *Burka v. New York City Trans. Auth.*, 110 F.R.D. 595, 601 (S.D.N.Y. 1986).  For the reasons discussed above, the defects in plaintiffs' showing with respect to commonality and typicality preclude a finding that the adequacy-of-representation requirement has been met.  Until it has been established that there are questions of law or fact common to the class, and that named plaintiffs bring claims typical of those brought on behalf of the class, it is premature to address defendant's specific arguments with respect to any individual conflicts of interest or agendas purported to be "antagonistic to proposed class members."  (Def.'s Opp'n Mem. 43 (citing *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 209 F.R.D. 323, 338 (S.D.N.Y. 1986).)

## CONCLUSION

For the foregoing reasons, plaintiffs' motion [46] has been denied without

prejudice to renew.

SO ORDERED.

Dated: New York, New York
September 5, 2006

Richard J. Holwell
United States District Judge