UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANNY ATTENBOROUGH, et al.,

                           Plaintiffs,

-against-

CONSTRUCTION AND GENERAL BUILDING
LABORERS' LOCAL 79,

                           Defendant.

CECIL BELL,

                           Plaintiff,

-against-

CONSTRUCTION AND GENERAL BUILDING
LABORERS' LOCAL 79, and FRANK
NOVIELLO,

                           Defendants.

03 Civ. 4399 (RJH)(THK)

**MEMORANDUM OPINION
AND ORDER**

04 Civ. 6520 (RJH)(THK)

       In these consolidated cases 18 individual plaintiffs allege that they were subject to discrimination because the predominately white leadership of defendant Construction and General Building Laborers' Local 79 ("Local 79" or the "Union") favored its relatives and friends when referring out union jobs, resulting in disparate treatment of, and a disparate impact on, minority members of the Union, including plaintiffs.  Certain of the plaintiffs further allege that Local 79 retaliated against them for bringing these actions. Defendants now move for summary judgment on all claims.  Defendants argue that plaintiffs have produced no evidence of disparate treatment or disparate impact, and that whatever evidence plaintiffs have of retaliation is largely inadmissible hearsay.  For the reasons that follow, defendants' motions are granted in part and denied in part.

## BACKGROUND

Many of the undisputed facts concerning the Union's referral practices are set forth in the Court's prior opinion denying plaintiffs' motion for class certification, familiarity with which is presumed.  *See Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79*, 238 F.R.D. 82, 85–88 (S.D.N.Y. 2006) ("*Attenborough I*").  Therein the Court concluded that in the complete absence of statistical evidence of disparate impact or treatment and considering the generalized nature of plaintiffs' anecdotal evidence, plaintiffs had failed to establish the commonality and typicality requirements of Rule 23(a).  *Id.* at 95–100.  Nevertheless, plaintiffs were given leave to conduct additional discovery on the issues of commonality and typicality and, thereafter, to file a renewed motion to certify a class.  *Id.* at 100.  Plaintiffs elected not to seek further discovery or to renew their class certification motion.  Accordingly, the only claims before the Court are those of the 18 individual plaintiffs.  The Court reviews that record in a light most favorable to the plaintiffs.

### *The Union's Referral Rules for Laborers*

Defendant Local 79 is a labor union whose roughly 7,000 members (collectively, "laborers") work in a variety of construction trades, including demolition, the tending of bricklayers (known as "mason tending"), exterior building restoration, and general conditions work.  (Def.'s R. 56.1 Stmt. ¶¶ 1, 4.)[1]  Frank Noviello was Local 79's president from 2000 to 2004.  (Vitale Decl. for *Bell* Ex. 2 at 65.)  Local 79 is an affiliated local of the Mason Tenders District Council ("MTDC"), which collectively bargains on

---

[1] Citations, unless noted otherwise, are to papers filed in *Attenborough*, the lead case in the consolidated cases of *Attenborough* and *Bell*.

Local 79's behalf, and both entities are affiliates of the Laborers International Union of North America ("LIUNA"). (Def.'s R. 56.1 Stmt. ¶ 1.) One of the primary functions of Local 79 is to refer its members for laborer positions in the New York City area in accordance with a set of rules set forth in various collective bargaining agreements. (*See id.* ¶¶ 8–15.) Plaintiffs concede that the referral rules are "fair and objective," but allege that, at the request of the Union's business agents, the Union Hiring Hall Director would bypass the rules to refer friends and relatives to desirable jobs. (Pltfs.' Mem. Opp. Summ. J. at 5–6.)

None of the collective bargaining agreements at issue require contractors to hire particular laborers referred by the Union. (Def.'s R. 56.1 Stmt. ¶ 7.) Contractors may refuse to hire a referred laborer, and the Union will simply refer another laborer in his or her place. (*Id.*) Similarly, the agreements do not require contractors to employ Union referrals for a minimum length of time. (*Id.*) Rather, the agreements require that a certain number of jobs be filled by referrals from the Union, with the remainder of laborers directly selected by the contractor. (*Id.* ¶¶ 6–7.) The collective bargaining agreement with the Contractors Association of Greater New York, for example, requires 50 percent of all hires after the first eight to be from Union referrals. (*Id.* ¶ 6.) Because many jobs covered by collective bargaining agreements require only a few laborers, a large majority of laborer positions are filled by Union members who have *not* been referred by the Union. (Delgado Decl. ¶ 6.)

When an opening is filled through referral, the Union's written policy mandates that referrals be distributed on a "first in-first out" basis, with several important exceptions. (*Id.* ¶ 8; *see* Delgado Decl. Ex. 2, "Construction and General Building

Laborers, Local 79 Hiring Hall Rules.")  Under the policy, Union members applying for

work must first register on the "Out-of-Work List" (the "OOWL").  (Def.'s R. 56.1 Stmt.

¶ 10.)  An applicant may choose (as many plaintiffs did) to limit his work preferences

(e.g., to "general conditions" work only) or his location preferences (e.g., to Manhattan

and Bronx only).  (*Id.*; Delgado Decl. ¶ 8(a).)  Members are never referred to jobs in

work areas or locations that they excluded.  (Delgado Decl. ¶ 8(a).)  Members are also

divided into four tiers, labeled A, B, C, and D respectively.  (*Id.* ¶ 8(b).)  Members who

have 4,000 or more hours qualify for Tier A status.  (*Id.*)  Higher tiers get priority over

lower tiers.  In other words, if two members had identical work and location preferences

but one was Tier A and the other Tier B, the Tier A member would be referred before the

Tier B member regardless of when each member registered with the OOWL.  (*Id.*)  To

summarize, when a job comes in, the Union looks first to the Tier A members on the list,

and if the job meets the preferences of any of those members, those members will be

referred in the order they registered.  If the job meets none of the Tier A members'

preferences, the Union will look to the Tier B members on the list, and if the job meeets

the preferences of any of those members, those members will be referred in the order they

registered.  The Union will then repeat the process with Tiers C and D.  (*See id.*)

Union members can be removed from the OOWL for various reasons.  Of course,

a member's name will be removed if he or she is referred out, but the member may return

to the same place on the OOWL if his or her referral or sequence of referrals results in

fewer than 15 cumulative days of employment.  (Def.'s R. 56.1 Stmt. ¶ 14.)  Members

can also be removed if they obtain work without a referral.  (*Id.*)  Finally, members are

required to re-register every calendar year, and failing to re-register results in removal

from the list.  (*Id.*)


### Shop Steward Appointments

Shop stewards are laborers appointed to a job who serve as the first line of representation for the Union and file reports on the hours worked by all laborers at the site.  (Delgado Decl. ¶ 8(c)).  Shop stewards are appointed by the Union's Business Manager and are not selected according to the rules governing referrals.  (*Id.*) Registration on the OOWL is not required, but all shop stewards must take certain Union-offered classes to attain and maintain shop steward certification.  (*Id.*)  Virtually every member is eligible to take these classes.  (*Id.* ¶ 12.)  The decision to appoint a shop steward is entirely within the Business Manager's discretion.  (*Id.* ¶ 8(c).)  During the period in question, the Union had four Business Managers:  Joseph Speziale from at least December 1997 until October 2001; Keith Localzo from November 2001 until November 2004; Kenneth Brancaccio from December 2004 though May 2005; and John Delgado from June 2005 to the present.  (Def.'s R. 56.1 Stmt. ¶ 17.)


### Anecdotal Evidence of Disparate Impact and Treatment

Plaintiffs' primary evidence of discrimination is their own testimony, particularly the testimony of James Bynum.  From 1996 to 2000, Bynum worked as a business agent[2] at Local 79's Hiring Hall, and thereafter as a laborer.  (Smith Decl. Ex. 2 ¶ 2.)  One of Bynum's specific job responsibilities for the four years he worked as business agent was

---

[2] Local 79 employs twenty to twenty-five business agents, who are typically assigned to specific geographic areas within New York City.  (Pltfs.' Third Am. Compl. ¶ 52.)  Shop stewards report to the business agent responsible for the geographic area in which the job is located.  (*Id.* ¶ 51.)  Business agents report to the union's Business Manager or Assistant Business Manager.  (*Id.* ¶ 52.)

serving as Assistant to the Hiring Hall Director, William Schmidt, from 1996 to 1998. (*Id.*; Smith Decl. Ex. 10 at 13, 16.)  As the Local 79 officer in charge of referrals, Schmidt would match Union members on the OOWL with the 20 to 30 jobs that were called in on a daily basis.  (Smith Decl. Ex. 10 at 148.)  As Schmidt's assistant, Bynum would actually call the members on Schmidt's behalf to see if they wanted the job.  (*Id.* at 16.)  Because Schmidt had a "see nobody policy," i.e., he didn't speak to or see Union members, Bynum would also speak to any members who came in person to request work or complain about referrals they had gotten.  (*Id.* at 146.)

Bynum gave testimony that Schmidt did not follow the OOWL when making referrals among the 20 to 30 jobs that came in daily.  (*Id.* at 146–51.)  At his deposition, Bynum testified that "Billy takes this crap [the list of available jobs] home and he plays with it and figure[s] out who he sends to where . . . ."  (*Id.* at 148.)  He testified that the OOWL was "garbage" (*id.*) and that Billy didn't follow it or any other of the Union's hiring rules (*id.* at 151 ("Billy had no rules.  Billy did what Billy wanted to do.")).  Business agents would regularly ask Schmidt for "favors," requesting that their friends and family get referrals ahead of other members on the OOWL.  (*Id.* at 151–59; 172–73.)  After Bynum went back to work as a laborer in 2000, Bynum recalled at least one time when business agents sent "two of their buddies down" to work on "a job" that might not have been referred off the OOWL.  (*Id.* at 69–70.)

Bynum, however, was unable to identify any specific individuals who were referred out of turn for a laborer position.  (*Id.* at 68–69 ("I can't say personally because I don't know if people were on the list [OOWL], so I really can't say that . . . .").)  Nor was Bynum able to state how frequently Union business agents made such requests.  (*Id.* at

152 ("[E]veryone did a favor once in a blue [moon].  Everybody [who] ever worked there . . . at one point of time or another.").)  If a union member walked into the hiring hall, looking for an assignment, however, Bynum testified that they frequently ("millions of times") bypassed the list.  (*Id.* at 150.)  Thus, if there was a job available "right there and then, we give it to whoever walked in the door." (*Id.*)  Bynum apparently spoke directly to these walk-ins since the Hiring Hall Director, as noted, followed a "see nobody policy."  (*Id.* at 146.)  Bynum did not testify regarding the racial composition of the union members who were referred to laborer jobs in this manner.[3]

Certain plaintiffs also claim that Union cronies "jumped over" them on the OOWL to be appointed to desirable shop steward positions.  (Pltfs.' Mem. Opp. Summ. J. at 27–30.)  Specifically, Michael Harrison, Michelle Mitchell, Thomas Flowers, Beverly Colon, Frank Ingram, Nerissa Hairston, Danny Attenborough, Willie Lewis, Cecil Bell, Leon Henry, and Harold Wright claim that on one or more occasions, members further down on the OOWL received assignments as shop stewards.  (*Id.*)  Joseph Franco, Peter Dinuzzo, Joseph Chiappette, and Michael Mongelluzzo are identified as union cronies who jumped over various plaintiffs.  (*Id.*)  As the Court previously noted, however, a member's position on the OOWL has nothing to do with qualification for appointment as shop steward and, therefore, cannot give rise to an inference of discrimination.  *Attenborough I*, 238 F.R.D. at 99–100.

Aside from the jumping, Bynum also gave testimony that shop stewards were

---

[3] Only one of the plaintiffs testified as to a specific incident of being "jumped over."  Plaintiff Beverly Colon alleges that she was jumped over on the OOWL in the fall of 2001.  (*See* Smith Decl. Ex. 31 at 71.)  According to Colon she received a call from Denise Echevarria, the Assistant to the Director of the Hiring Hall, telling her that she would be referred to a job that "was going to be a year or more." (*Id.*)  She overheard in the background, however, the Director (Schmidt) telling Echevarria to call her back.  (*Id.* at 71–72.)  Echevarria called back later to say that someone else had been referred to the long-term job.  (*Id.* at 73.)  Plaintiffs offer no evidence as to the identity or race of the individual so referred, or his position on the OOWL relative to Colon's.

frequently selected based on nepotism and cronyism rather than the quality of their work. (*Id.* at 216–259.)  He described some Union members as "super shop stewards" because "[t]hey don't go out as nothing else" and are "never out of work."  (*Id.* at 218, 224.) Ultimately, it was the business manager who determined who was appointed a shop steward (*id.* at 226, 228), but people would first approach Schmidt if they wanted a steward appointment (*id.* at 228).  Bynum identified several of beneficiaries of the system including Mike Brennan, Joe Giardino, Joe Mastrione, and Robert Sporano, among others, and matched them with their benefactors in the Union leadership.  (*Id.* at 218– 231.)  Regarding the quality of their work, Bynum branded Brennan a "wino," said Giardino's uncle was "a real mobster," and described Sporano as "an accountant" with "no construction history ever."  (*Id.* at 218, 222, 231.)  In his declaration, Bynum gave a list of 22 people he had identified as "super shop stewards."  (Smith Decl. Ex. 2 ¶ 10.) Bynum testified that he based his conclusions both on personal experience—i.e., witnessing business agents pushing for their "cronies"—and his knowledge that certain members were never out of work despite numerous other members having the same qualifications to be shop stewards.  (*See, e.g.*, Smith Decl. Ex. 10 at 221, 225.)

Two other plaintiffs gave testimony concerning shop steward appointments. Michael Harrison testified that he had been taken off a shop steward job when it became more lucrative and was replaced by a "crony."  (Smith Decl. Ex. 30 at 195–212.)  Frank Ingram testified that he received a shop steward appointment immediately after threatening to sue Local 79, despite having no experience in the position.  (Smith Decl. Ex. 32 at 120–27.)

***Statistical Evidence of Disparate Impact***

As for statistical evidence of the impact of Local 79's practices, plaintiffs offer evidence of the racial composition of Local 79's leadership from 1996 to 2001 as well as the race of those people identified as "super shop stewards."  (*See* Smith Decl. Ex. 2 ¶¶ 8–10.)  During that time, Local 79's Executive Board was composed entirely of white males, mostly of Italian origin.  (*Id.* at 10.)  The Union's business agents—31 in total— were roughly 71 percent white (22 out of 31), 16 percent Hispanic (5 out of 31), and 13 percent black (4 out of 31).  (*Id.*)  Except for one man whose race is unidentified, all of the "super shop stewards" identified by Bynum are white (*id.*) and worked an average of 1,823.8 hours per year from 2000 to 2004 (*see* Pltfs.' Mem. Opp. Summ. J. at 17; Smith Decl. Ex. 21 at 1).  Plaintiffs, who are all black, worked an average of 801.9 hours per year between 2000 and 2004.  (*See* Pltfs.' Mem. Opp. Summ. J. at 16; Smith Decl. Ex. 21 at 2.)

Plaintiffs offer no statistical evidence as to the racial breakdown of the 7,000 union members, their position on the OOWL, the job and location preferences they specified, the jobs to which they were referred, or the pay that they earned.  Accordingly, there is no statistically significant evidence that minority members of Local 79 work fewer hours or earn less money than similarly situated whites, let alone that the Union's administration of the OOWL referral system causes such a result.

Plaintiffs argue, as they did on the class certification motion, that they were unable to develop statistical evidence of disparate impact or treatment because the Union failed to prepare and file EEO-3 Reports.  In December 2005, the EEOC contacted Local 79 to inquire into the Union's failure to file an EEO-3 Report.  (Def.'s R. 56.1 Stmt. ¶

27.)  EEO-3 Reports require local unions to provide data every two years concerning the race and sex of their membership and a breakdown of job referrals by race and sex for a two-month period during the year.  (*See* Delgado Decl. Ex. 9.)  The report specifies that the information provided "may be obtained by visual survey, from records made after employment, from personal knowledge or by self-identification."  (*Id.*)  In response to the EEOC's inquiry, Local 79 filed an EEO-3 Report in 2006.  (Def.'s R. 56.1 Stmt. ¶ 28.)  Prior to 2006, Local 79 had not filed any reports with the EEOC.  (*Id.* ¶ 26.)

The Court addressed this issue, at least in part, by reopening discovery to permit plaintiffs to gather statistical evidence to support their claims.  *See Attenborough I*, 238 FRD at 100; *see also* Tr. of Oral Arg. dated March 28, 2006 at 18, 20 (recognizing that denial of plaintiffs' motion to compel production of non-existent EEO-3 Reports is "not to say that the same information or relevant information can't be sought in another manner. . . . clearly it can be"; "the reality . . . is that [plaintiffs] should attempt to get statistics or race-related data from the defendants").  Plaintiffs declined the Court's invitation to seek further discovery but now request an adverse inference of discrimination based on the Union's failure to file EEO-3 Reports prior to 2006.  This request will be discussed below.

### *Plaintiffs' Evidence of Retaliation*

Plaintiffs Bell, Bynum, Flowers, and Wright also claim that the Union retaliated against them for filing charges of discrimination with the EEOC.  In support of their claim, plaintiffs offer the following evidence:

Cecil Bell:  Bell offered testimony that in January 2004 he received a call from

Jack Klein of Silverstein Properties, the developer of a property at WTC 7 in Lower

Manhattan.  (Smith Decl. Ex. 23 at 36.)  Klein discussed Bell's resume with him and

ultimately told him that he would have a job working at WTC 7 in "a couple of days."

(*Id.* at 36–37.)  It is inferred that Bell's employer would be Tishman Construction, the

general contractor for the development of WTC 7.  Bell was not hired, however, for

several months.  (*Id.* at 48.)  Moreover, when he was hired in May of 2004, it was

actually on a referral by the Union from the OOWL rather than directly by Klein or

Tishman.  (*Id.* at 41–42.)  Bell's employment was terminated by Tishman shortly

thereafter, but that event is unrelated to his retaliation claim.  (*Id.* at 65–66.)  Bell

subsequently had another conversation with Klein, which Bell taped.  In that

conversation, Klein said the following in response to Bell's inquiry as to why he had not

been hired directly by the developer/contractor in January:

> I went to your president, the president of your union [defendant Noviello] and
> asked him to put you on your job, on, on my job.  And he says, "Look Jack, I'm
> not a real big fan of this guy; he's got issues."  I don't know what that means,
> right?  He said, "but he's got issues with the union."  And I don't know what that
> means, but I went to the president of your union and I'm tellin' ya, under normal
> circumstances Frankie [Noviello] would have done whatever I asked him to do.
>
> He [Noviello] said, he says "I got other guys who . . . have priority here," and he's
> says that, "you know what?" he says, "the guy's got issues."

(Smith Decl. Ex. 24 at 1–2.)

Thomas Flowers:  Flowers offered records from his trust fund indicating that he

worked 1,864 hours in 2001, 1,287 hours in 2002, and 613 hours in 2003.  (*See* Smith

Decl. Ex. 26.)  Flowers gave testimony that his hours declined in 2003 as a consequence

of his filing charges with the EEOC.  (Smith Decl. Ex. 27 at 59–60.)  With over 16,000

total hours with the Union and "all the qualifications," Flowers concluded that the lawsuit

was the only cause of his failure to get work.  (*See id.* at 59–63.)  The Union offered

evidence not disputed by Flowers that beginning in 2003 Flowers began declining jobs

that were referred to him.  (*See* Adams Decl. ¶ 17; Adams Decl. Ex. 10.)  While Flowers

had accepted 20 of 21 referrals from the OOWL offered to him before December 2002,

he rejected or failed to respond to 18 of 20 calls between 2002 and 2005.  (*See* Adams

Decl. ¶ 17; Adams Decl. Ex. 10.)

   <u>James Bynum</u>:  Bynum offered testimony that after filing his charge with the

EEOC, Bynum received no more shop steward appointments.  (Smith Decl. Ex. 10 at 95–

98.)  Bynum himself, however, attributed the Union's failure to appoint him to his

candidacy for office at Local 79, not to his filing of the charges.  (*Id.* at 98–100.)

   <u>Harold Wright</u>:  Wright offered testimony that in 2004, Bernard McCaffrey

offered him a job as foreman for Skanska Construction.  (Smith Decl. Ex. 29 at 144–45.)

Ultimately, however, another man, Paul Strauss, was hired by Skanska as the foreman.

(*Id.* at 147.)  Wright testified that he believed he didn't get the job because McCaffrey

"apprised [him] that there was a problem, Local 79 had a problem with [him]."  (*Id.*)

Plaintiffs did not depose McCaffey and offered no admissible evidence to support

Wright's charge.

## DISCUSSION

**I.     Summary Judgment**

**A.     Standard of Review**

Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986); *see Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir. 1998); *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 458 (S.D.N.Y. 2006). A party moving for summary judgment may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

A fact is considered "material" for purposes of Rule 56 if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Whether a material issue is "genuine" depends on whether the evidence is of a type that would permit a reasonable jury to return a verdict in favor of that party. *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003). In making its showing that a genuine issue of material fact exists, the nonmoving party may not rely on "the mere existence of a scintilla of evidence" to support its position, but must instead proffer "evidence on which the jury could reasonably find for the [plaintiff]." *Dawson v. County of*

*Westchester*, 373 F.3d 265, 272 (2d Cir. 2004) (citing *Anderson*, 477 U.S. at 252).

Although "[i]t is now beyond cavil that summary judgment may be appropriate even in

the fact-intensive context of discrimination cases," *Abdu-Brisson v. Delta Air Lines, Inc.*,

239 F.3d 456, 466 (2d Cir. 2001), it is "sparingly used where intent and state of mind are

at issue because . . . careful scrutiny of the factual allegations may reveal circumstantial

evidence to support the required inference of discrimination," *Graham v. Long Island

R.R.*, 230 F.3d 34, 38 (2d Cir. 2000) (citations omitted).


### B.     Local Rule 56.1

Local Rule 56.1 requires all parties moving for summary judgment to file a "short

and concise statement, in numbered paragraphs, of the material facts as to which the

moving party contends there is no genuine issue to be tried."  Local Civ. R. 56.1(a).

Parties responding to such a motion must respond to each numbered paragraph in the

movant's statement and support those responses with citation to evidence that would be

admissible at trial.  Local Civ. R. 56.1(b), (d).  Each numbered paragraph in the movant's

statements "will be deemed to be admitted for purposes of the motion unless specifically

controverted by a correspondingly numbered paragraph in the statement required to be

served by the opposing party."  Local Civ. R. 56.1(c).

In this case, although plaintiffs submitted a statement responding to each of the

numbered paragraphs in the statement submitted by defendants, almost none of their

responses contain citations to evidence.  (*See generally* Pltfs.' Resp. to Def.'s R. 56.1

Stmt.)  Indeed, few of defendants' statements are even explicitly denied.  Instead,

plaintiffs largely "object" to defendants' statements on various legal grounds, arguing, for

example, against defendants' "summary or characterizations of the document or testimony" and in favor of the "the document or testimony . . . speak[ing] for itself." Other examples include objections to "materiality," statements that violate the "best-evidence rule," and the use of hearsay evidence.

Plaintiffs' responses reflect confusion over the nature of the statements required by Local Rule 56.1.  The rule does not restrict movants to quoting documents, depositions, and affidavits.  It merely requires "short and concise statements" describing material facts and containing relevant citations to evidence.  Statements cannot be criticized for being "summar[ies] or characterizations of the document or testimony," because by definition that is exactly what they are.  Similarly, while respondents are permitted to make evidentiary objections, most of plaintiffs' are misplaced.  For example, affidavits—the most common form in which to present evidence on summary judgment—need not be admissible themselves.  *See Santos v. Murdock*, 243 F.3d 681, 684 (2d Cir. 2001).  Rather, they must either "be admissible themselves *or* must contain evidence that will be presented in an admissible form at trial."  *Id.* (emphasis added); *see also* Fed. R. Civ. P. 56(e).  It is therefore completely legitimate in a motion for summary judgment for affidavits to contain documents as exhibits and for movants' statements of fact to summarize those documents provided that the documents would be admissible at trial.  Plaintiffs' repeated objections based on violations of the "best evidence" rule are therefore completely out of place.  As for plaintiffs' hearsay objections, almost all of the documents relied on by defendants are business records admissible under the well-known exception to the hearsay rule.  *See* Fed. R. Evid. 803(6).  Finally, plaintiffs' objections based on "materiality" or the lack thereof, without further explanation, are largely

meaningless.

The law is clear that "blanket denials," wholesale evidentiary objections, and counterstatements unsupported by any citations are insufficient to create genuine issues of material fact.  *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 312–15 (2d Cir. 2008) (rejecting plaintiff's hearsay, materiality, and "speculation" objections to defendant's 56.1 statement when unsupported); *Chimarev v. TD Waterhouse Investor Servs., Inc.*, 280 F. Supp. 2d 208, 223 (S.D.N.Y. 2003) (rejecting "blanket denials" when unsupported by any citations to evidence).  Although the Court of Appeals has occasionally cautioned against deeming statements admitted under Local Rule 56.1(c), it has not done so when the motion was opposed and the district court found the movant's statements to be adequately supported by evidence in the record.  *See Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F .3d 241, 244 (2d Cir. 2004); *Giannullo v. City of New York*, 322 F .3d 139, 140–143 (2d Cir. 2003).

In all but a few rare instances where plaintiffs actually admitted to certain facts, wherever the Court cites to defendants' statement of facts, it has concluded that defendants have adequately supported their statements with citations to admissible evidence, and that plaintiffs have failed to properly controvert those statements.  To the extent possible, the Court nevertheless continues to consider the facts in a light most favorable to the plaintiffs.  *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir. 1999).

**II.      Racial Discrimination under Federal Law**

In support of each of their claims, plaintiffs make essentially the same argument. First, plaintiffs argue that their testimony, particularly that of James Bynum, creates a genuine issue of material fact regarding the existence of cronyistic practices at Local 79 which result in (a) referral for laborer positions of friends and relatives of white officers who are junior to plaintiffs on the OOWL and (b) the appointment of such cronies who are less qualified than plaintiffs to shop steward positions.  As statistical evidence on this claim, plaintiffs note that the average hours worked by the 22 identified cronies far exceeds that of the 18 plaintiffs.  Finally, plaintiffs argue that the racial impact of Local 79's referral and appointment practices is obvious from the race of Local 79's leadership, that of the cronies, and that of the plaintiffs themselves, i.e., from the fact that the leadership and their cronies are white, and plaintiffs are all black.  To the extent further evidence is needed, plaintiffs argue that they are entitled to an adverse inference from the fact that Local 79 failed to prepare bi-annual EEO-3 Reports of the Union's composition and referrals by race when they were required to do so by the EEOC.

The Court concludes that although plaintiffs may have offered sufficient evidence for a reasonable jury to conclude that some of Local 79's referrals to the laborer position and some of its appointments for shop steward reflect nepotism and cronyism, they have not met their burden of producing evidence that Local 79's practices actually caused disparate impact on minority union members.  Nor have they shown a pattern or practice of intentional discrimination, that is, that racial discrimination was the Union's "standard operating procedure."  *Bazemore v. Friday*, 478 U.S. 385, 398 (1986).

A.       **Disparate Impact Claims under Title VII**

Unlike claims alleging intentional discrimination based on race, "disparate impact claims are concerned with whether employment policies or practices that are neutral on their face and were not intended to discriminate have nevertheless had a disparate effect on the protected group." *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 160 (2d Cir. 2001) (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971)).  Like claims alleging intentional discrimination, "disparate impact claims involve three stages of proof." *Id.*  In the first and only stage with which the Court need concern itself, plaintiffs bear the burden of making a prima facie showing of disparate impact. *Id.*  "To make this showing, a plaintiff must (1) identify a policy or practice, (2) demonstrate that a disparity exists, and (3) establish a causal relationship between the two." *Id.* at 160; *accord Waisome v. Port Authority of New York and Jew Jersey*, 948 F.2d 1370, 1375 (2d Cir. 1991); 42 U.S.C. § 2000e-2(k) (2006).

As an initial matter, the Court concludes that Bynum's anecdotal testimony is sufficient to create a genuine issue of whether there was, in fact, a practice of referring friends and relatives to laborer positions without regard to the OOWL, at least between 1996 and 2000.  Bynum testified that during this period he personally observed the referral of people who were friends and relatives of various business agents in violation of the Union's written policies.  (*See* Smith Decl. Ex. 10 at 151–59, 172–73, 216–59.) Although Bynum also testified that he really did not know where the alleged cronies stood on the OOWL and that the practice was not normal but done as "a favor once in a blue [moon]," (*Id.* at 68–69, 152), the factual allegations, when viewed in a light most favorable to plaintiffs, could lead a reasonable juror to conclude that a practice of some

18

sort existed.  Bynum also identified several "cronies" that he claimed received regular shop steward appointments because of their connections rather than the quality of their work.  (*Id.* at 216–59; Smith Decl. Ex. 2 at 4–6.)  A reasonable juror could thus conclude that a practice of some degree of favoritism existed with respect to the appointment of shop stewards.  The Court rejects defendants' argument that Bynum's testimony was insufficiently specific because he could not cite specific dates and times when these referrals occurred.  (*See* Def.'s Mem. Supp. Summ. J. at 15 n.14.)  The fact that he did not single out good examples in his deposition goes to his testimony's weight, not its admissibility as evidence.  *See Zakre v. Norddeutsche Landesbank Girozentrale*, 396 F. Supp. 2d 483, 504 (S.D.N.Y. 2005) ("The lack of certain specific details or arguably vague statements will not render the affidavit inadmissible, but affect the weight and credibility of the testimony, which have to be determined by the trier of fact at trial.").

There is some question as to whether plaintiffs have offered evidence of informal referrals during the period after Bynum left his Union job some time in November of 2000 sufficient to satisfy the "continuing violation" exception to Title VII's statute of limitations.  *See Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993) ("Under the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone.").  Because the statute of limitations under Title VII is 300 days from the date of the discriminatory action, and because the earliest plaintiffs filed charges with the EEOC was December 10, 2002, defendants argue that testimony concerning Union referral practices prior to February 13,

2002 is irrelevant.  (Def.'s Mem. Supp. Summ. J. at 9, 36.)  The Court need not reach this issue, however, in light of its holding concerning disparate impact and causation.  The Court will therefore assume, *arguendo*, that plaintiffs have produced sufficient evidence for a reasonable jury to conclude that Local 79 had a continuing practice of referrals based on nepotism and cronyism from 1996 through at least the filing of this lawsuit, and therefore that plaintiffs have satisfied the first prong of their prima facie case.

Plaintiffs encounter far more difficulties in their attempt to satisfy the second and third prongs of their prima facie case.  First and foremost, plaintiffs lack any statistical evidence of racially disparate impact with respect to either the laborer or shop steward positions.  Although plaintiffs asserting other discrimination claims will typically rely on both anecdotal and statistical evidence, statistical evidence takes on special importance for plaintiffs in disparate impact cases.  *Robinson*, 267 F.3d at 158, 160 ("As with the liability phase of a pattern-or-practice disparate treatment claim, statistical proof almost always occupies center stage in a prima facie showing of a disparate impact claim.").  Plaintiffs themselves concede that statistics are "undisput[edly] a core element of any disparate impact case."  (Pltfs.' Mem. Opp. Summ. J. at 8.)  Indeed, the Court of Appeals has described plaintiffs' burden of proof largely in terms of statistical evidence.  *See Waisome*, 948 F.2d at 1375 ("The rule that emerges from prior cases is that a prima facie case is made out by showing either a gross statistical disparity, or a statistically significant adverse impact coupled with other evidence of discrimination.").  Other Circuits have explicitly held that disparate impact claims cannot be proven by anecdotal evidence alone.  *See Isabel v. City of Memphis*, 404 F.3d 404, 411 (6th Cir.2005); *Krauel v. Iowa Methodist Medical Ctr.*, 95 F.3d 674, 681 (8th Cir. 1996); *Budnick v. Town of*

*Carefree*, 518 F.3d 1109, 1118–19 (9th Cir. 2008).  And courts in this district have frequently noted the absence of statistical evidence in concluding that plaintiffs' disparate impact claims failed.  *See Evans v. Port Authority of New York and New Jersey*, 192 F. Supp. 2d 247, 252 n.9 (S.D.N.Y. 2002); *Rodriguez v. Beechmont Bus. Serv., Inc.*, 173 F. Supp. 2d 139, 147–48 (S.D.N.Y. 2001); *Cortez v. City of New York*, No. 99 Civ. 4304, 2001 WL 410092, at *7 (S.D.N.Y. 2001) ("[P]laintiff presents no statistical evidence that a protected class is adversely affected, thereby failing to state a prima facie case of disparate impact discrimination.").

To the extent plaintiffs are arguing that they themselves constitute a representative, statistically significant sample of black Local 79 members, and that therefore a reasonable jury could infer disparate impact from plaintiffs' lower average hours relative to the average hours of the alleged cronies, plaintiffs are mistaken. Disparate impact claims concern the entire population affected by the identified practice, not merely the subset of affected laborers who happen to have brought suit.  *See Smith v. Xerox Corp.*, 196 F.3d 358, 369–70 (2d Cir. 1999), *overruled on other grounds*, *Meacham v. Knoll Atomic Power Lab.*, 461 F.3d 134, 140 (2d Cir. 2006).  Although "[n]ecessity often dictates that the composition of a given population be estimated by projecting data gathered by less than optimal means from only a sample of that population," that sample must be representative of the population.  *Guardians Assoc'n of New York City Police Dept., Inc. v. Civil Service*, 633 F.2d 232, 240 (2d Cir. 1980); *accord Rowe Ent., Inc. v. William Morris Agency, Inc.*, No. 98 CIV 8272, 2003 WL 22124991, at *1 (S.D.N.Y. Sep. 15, 2003) ("[T]he population is the whole class of units that are of interest; the sample is a set of units chosen for detailed study.  Inferences from

the part to the whole are justified only when the sample is representative.") (quoting Federal Judicial Center, *Reference Manual on Scientific Evidence* 90 (2d ed. 2000)). Where the sample is not representative, inferences concerning the larger population are simply not reasonable because "[i]n any large population a subset can be chosen that will make it appear as though the complained of practice produced a disparate impact." *Smith*, 196 F.3d at 369.

There is absolutely no reason to believe—and plaintiffs offer none—that they are a representative sample of black or minority members of Local 79. As a sample, plaintiffs are obviously biased towards lower hours because plaintiffs have self-selected based on the alleged harm they have suffered. Similarly, the white population selected— i.e., the 22 alleged cronies—is biased towards higher hours because they were selected based on their continuous shop steward appointments. Courts have repeatedly rejected statistical analysis based on samples with obvious bias. *See, e.g.*, *Rowe Ent., Inc.*, 2003 WL 22124991, at *3 (rejecting sample of contracts awarded to black and white entertainment artists in discrimination suit when selected by plaintiffs' attorneys without any methodology); *Collier v. Plumbers Union Local No. 1*, No. 05 CV 2191, 2007 WL 1673047, at *4 (E.D.N.Y. June 7, 2007) (rejecting sample when composed of 13 women and no men in claim of disparate impact on gender).

To the extent plaintiffs are arguing that a reasonable juror could infer that white members of the Union received significantly better treatment than members who were racial minorities simply because the Union's leadership was predominantly white, plaintiffs are also mistaken. Even if it were reasonable to infer that the Union's leadership would favor other whites, there is no basis in the record for inferring that this

favor extended to anyone beyond the 22 alleged cronies out of a pool of roughly 7,000 members.

Finally, it is not reasonable to infer from plaintiffs' hours alone that Local 79's referral system caused the Union's black members *as a group* to get disproportionately less work. Even if the Court assumes that the hours of the Union's minority members were proportionately less than that of white members (and there is absolutely no statistical basis for such an assumption), plaintiffs offer insufficient evidence that it was the alleged nepotism and cronyism that caused this result. For example, plaintiffs claim that they were equally "qualified" for shop steward positions, and therefore that only nepotism and cronyism could have caused a difference in appointments. But plaintiffs' testimony that they were "qualified" is simply insufficient without comparable data concerning similarly situated white Union members. *See Collier*, 2007 WL 1673047, at *4. It is equally likely that many more white candidates were just as qualified and did not get the shop steward appointments or other referrals that plaintiffs allege they deserved. Indeed, Bynum admits as much in his deposition. (Smith Decl. Ex. 10 at 216 ("Q: Are blacks and Hispanics the only members who have been harmed by this nepotistic and cronyistic job referral system? A: No, mostly just—it hurts everybody in one way or the other. I know a couple of white guys who are being screwed around by Local 79.").) Similarly, plaintiffs' anecdotal evidence that they should have gotten appointments in specific instances does not give rise to a reasonable inference that the Union's black members were bypassed more frequently than the Union's white members. *See Smith*, 196 F.3d at 369 ("Yet, when the entire group is analyzed any observed differential may

disappear, indicating that the identified employment practice was not the cause of the disparity observed in the subset.").

Perhaps realizing that they have not produced sufficient evidence, plaintiffs argue that they are entitled to an inference that Local 79's referral practice had a discriminatory impact—or that Local 79 was intentionally discriminating based on race—because Local 79 failed to keep records of membership and referrals based on race in violation of EEOC rules.  As a general matter, when a party has "destr[oyed] or significant[ly] alter[ed] . . . evidence, or . . . fail[ed] to preserve property for another's use as evidence in pending or reasonably foreseeable litigation," the opposing party may be entitled to "an inference that the evidence would have been unfavorable to the party responsible for its destruction."  *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001). Depending on the circumstances, courts may require the destruction to be intentional, in bad faith, the result of gross negligence, or contrary to law.  *Id.* at 108.

An adverse inference under the spoliation rule is inappropriate in this case for the simple reason that no evidence was "destroyed."  There was no spoliation; indeed, plaintiffs were provided access to all the Union's referral records for the relevant period and then invited by the Court to serve additional discovery requests to meet their burden of showing disparate impact.  (*See* Tr. of Oral Arg. dated March 28, 2006 at 20, 21.) Plaintiffs simply declined to do so.  And while that additional discovery *may* have shown disparate impact, the EEO-3 Reports for 2002 and 2004 would likely not have done so. As evidenced by the 2006 Report, the Union would have reported only gross statistics for the race of a random sample of its members and the race of referrals (and that for only a

two-month period).[4]  And since EEO-3 Reports do not control member's geographic and job-type preference, or for hours worked and income, plaintiffs would still have to analyze the underlying referral records to provide any probative evidence.  This they were not prepared to do.  Furthermore, even if the spoliation rule should be broadened to include the failure to generate evidence which the party had a duty to generate, there is no proof that Local 79 failed to generate EEOC reports in anticipation of litigation.  Indeed, the documents upon which such reports would be based remain accessible today.  Finally, the cases plaintiffs cite for the contrary conclusion are entirely inapposite.  In *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376 (2d Cir. 2001), the Court of Appeals merely held that when the party destroys records that it had a duty to retain, the *mens rea* component of the spoliation rule could be presumed.  *Id.* at 383.  Here there was no destruction of records, and the Court refuses to presume *mens rea* from inaction.  The only other case plaintiffs cite is *EEOC v. Local 638*, 81 F.3d 1162 (2d Cir. 1996).  In that case, however, the issue was whether a union should be held in contempt for violating an injunction, not whether the plaintiff was entitled to an adverse inference from the defendant's conduct.  *See id.* at 1172.

### B.     Disparate Treatment Claims under Section 1981

Plaintiffs' second claim is that "Local 79's nepotistic and cronyistic referral practices constitute intentional discrimination as part of an established pattern and

---

[4] In the 2006 Report the Union estimated that whites comprised 37 percent of membership, blacks approximately 26 percent and Hispanics approximately 36 percent.  (*See* Delgado Decl. Ex. 9.)  Total referrals covered by the report were 13 percent white, 23 percent black and 63 percent Hispanic.  (*See id.*)  Defendant concedes that these statistics are too rough to permit any inferences to be drawn, but they surely hint at no problem attributable to referrals of laborers from the OOWL.  The Court further notes that the EEO Reports would have provided no data at all regarding shop steward appointments.  (*See id.*)

practice of disparate treatment in violation of 42 U.S.C. § 1981." (Pltfs.' Third Am. Compl. at 30.)[5] Section 1981 provides, in pertinent part, that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a) (2006). Although there are differences between the statutes, the standard of proof for disparate treatment claims under 42 U.S.C. § 1981 is the same as for disparate treatment claims under Title VII. *Patterson v. County of Oneida, New York*, 375 F.3d 206, 225 (2d Cir. 2004) ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 or the Equal Protection Clause . . . ."). Most importantly, plaintiffs bringing a claim for disparate treatment under either Title VII or Section 1981 "must show that the discrimination was intentional." *Id.* at 226. Where the plaintiff alleges a "pattern or practice" of discrimination, "plaintiffs must establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Bazemore*, 478 U.S. at 398 (citations and quotes omitted).

As with disparate impact claims, statistical evidence is critical to the success of a pattern-or-practice disparate treatment claim. *Robinson*, 267 F.3d at 158, 160. "Moreover, the statistics must be of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity." *Id.* at 160. As the Court has noted above, to the extent plaintiffs have come forward with any statistical evidence,

---

[5] Plaintiffs made no effort to establish individual intentional discrimination under the rubric of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Accordingly the Court limits its analysis to plaintiffs' pattern and practice claim. *See Robinson*, 267 F.3d at 158, n.5.

that evidence is woefully inadequate to demonstrate that black and Hispanic members of Local 79 have suffered systemic discrimination, under either theory.

Plaintiffs' theory concerning disparate treatment, however, suffers from a more fundamental flaw. Plaintiffs' argument is that the Local 79 leadership engaged in "nepotism and cronyism," i.e., that the leadership selected members for better referrals and shop steward appointments because they were either family or friends. But if the Local 79 leadership favored members because they were family or friends, they were not favoring members because they were white nor were they excluding plaintiffs because they were black. Again, Bynum's own testimony alleges that non-crony white members of the Union were being treated unfairly as well (*See* Smith Decl. Ex. 10 at 216), and plaintiffs have produced no evidence that any white members received favorable treatment besides the 22 alleged cronies. Accordingly, the Court concludes that plaintiffs' evidence does not raise an inference of intentional discrimination, and therefore that their claim under Section 1981 also fails.

## III.     Plaintiffs' Retaliation Claims

As their sixth and final claim, plaintiffs allege that James Bynum, Cecil Bell, Thomas Flowers, and Alex Wright have directly experienced retaliation by Local 79 as a result of their assertions of their civil rights. Under 42 U.S.C. § 2000e-3(a), "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a) (2006). To prevail in a retaliation case,

the plaintiff must show that he engaged in protected participation or opposition under Title VII, that the employer was aware of this activity, that the employer took adverse action against the plaintiff, and that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.

*Sumner v. U.S. Postal Service*, 899 F.2d 203, 208–09 (2d Cir. 1990).

In Wright's case, the only evidence linking the charges he filed with his failure to get a foreman job with Skanska Construction was his testimony concerning a conversation he had with Bernard McCaffrey.  In that conversation, McCaffrey allegedly told Wright that he didn't get the job because "Local 79 had a problem with [him]." (Smith Decl. Ex. 29 at 147–48.)  Plaintiffs did not depose McCaffrey or seek to identify the union representative to whom McCaffrey allegedly spoke.  Thus, McCaffrey's out-of-court statement is Wright's only evidence of a retaliatory link.  Without admissible evidence of a causal link, Wright's retaliation claim must fail.  *See LaMarch v. Tishman Speyer Props., L.P.*, No. 03 Civ. 5246, 2006 WL 2265086, at *8 (E.D.N.Y. Aug. 8, 2006) ("[Plaintiff] cannot pursue a retaliation claim on the basis on a phone call that Adam Hochfelder allegedly received from an unnamed party at TSP, because [plaintiff's] testimony regarding what Hochfelder told him about that phone call is inadmissible hearsay and [plaintiff] has offered no other evidence regarding the call.").

Flowers claims that after filing his EEOC claim in December 2002, Local 79 retaliated against him by bypassing him on the OOWL and referring other members to laborer positions.  (*See* Pltfs.' Mem. Opp. Summ. J. at 23.)  The sole piece of evidence offered by Flowers is that his hours dropped to 613 hours in 2003 from 1,287 hours worked in 2002.  (*See id.*)  However, Flowers does not offer a single instance in which a union member below him on the OOWL was referred to a job that Flowers would have

taken.[6]  Nor does Flowers even address the undisputed evidence that beginning in 2003

he started to refuse work to which the Union had referred him.  Prior to December 2002,

Flowers accepted 20 of 21 referrals offered to him.  (Def.'s R. 56.1 Stmt. ¶ 56; Adams

Decl. Ex. 10.)  Between December 2002 and June 2005 he rejected or failed to answer 18

of 20 calls.  (Def.'s R. 56.1 Stmt. ¶ 56; Adams Decl. Ex. 10.)  Flowers also let his

registration on the OOWL lapse between January and May 2003.  (Def.'s R. 56.1 Stmt. ¶

56.)  In September 2003, his registration lapsed again after he failed to accept referrals

made in multiple telephone calls over the prior two months.  (*Id.*)  One of the calls he did

not answer in July 2003 pertained to a job that continued until July 2005.  (*Id.* ¶ 57.)  This

pattern continued into 2004 when he turned down a referral in Manhattan at which other

union referrals accumulated over 1,000 hours.  (*Id.* ¶ 57.)  On this record, no reasonable

juror could conclude, other than by speculation, that Flowers' decreased hours in 2003

reflected retaliation by Local 79.

     Bynum alleges that as a result of his complaint to the EEOC filed on July 7, 2003,

the Union refused to appoint him to any shop steward position.  Bynum worked

frequently as a shop steward; his last appointment was to the Pinnacle job in April 2003.

(Smith Decl. Ex. 10 at 122.)  It is uncertain when the Pinnacle job ended.  Bynum

believed the job finished in August 2003.  (*Id.* at 95.)  The Union's Kenneth Brancaccio

stated that the job was over by June 17, 2003.  (Brancaccio Decl. ¶ 7.)  Without

specifying a particular date, Bynum testified that Brancaccio told him that he would

never work as a shop steward again.  (Smith Decl. Ex. 10 at 97–98).  It is undisputed that

Bynum was never appointed to a shop steward position after finishing the Pinnacle job.

---

[6] Flowers was only willing to perform general conditions work in the borough of Manhattan.  (Def.'s R.
56.1 Stmt. ¶ 60.)

(*See* Def.'s R. 56.1 Stmt. ¶ 42.)[7]  On the face of it, Bynum would appear to have a strong

prima facie case of retaliation given the proximity of the alleged retaliation to the filing

of his EEOC complaint.  He is unable to establish causation, however, as he explicitly

and exclusively attributes Brancaccio's refusal to appoint him to another shop steward

position to the fact that he, Bynum, was running a campaign to unseat Brancaccio from

his union office.

> Q.    Is that charge . . . are you alleging that Local 79 didn't refer you to
>        shop steward positions because of your candidacy for Union
>        office?
>
> A.    Yeah.  I would say that, yes.

(Smith Decl. Ex. 10 at 97.)

> Q.    Did he tell you why he was never going to have you be a shop
>        steward again?
>
> A.    No, he ain't give me no reason why.  Like I said, he had a little
>        funkie attitude due to the fact, like I said, because I ran against
>        him.  That was a big problem for him . . . .

(*Id.* at 98.)  Plaintiffs' counsel now attempts to discount Bynam's own testimony

as "hunches" with "weak probative value" (Pltfs.' Mem. Opp. Summ. J. at 24)

and argues that retaliation need only be a motivating factor, not the sole factor.

The latter point is a fair statement of the law but ignores the fact that Bynum does

not attribute Brancaccio's retaliation to *any* factor other than the hostility caused

by the election campaign.

Bell's claim of retaliation centers around his unsuccessful efforts to get a job on

the rebuilding of WTC 7 in January of 2004.  At that time Jack Klein, an employee of

Silverstein Properties, the project's developer, called Bell about getting a laborer's job

---

[7] Bynum allowed his qualification as a shop steward lapse in April of 2004 because he saw no sense in
applying for a job he was not going to get.  (Smith Decl. Ex. 10 at 199.)

with Tishman, the project's contractor.  (Smith Decl. Ex. 23 at 36–37.)  Klein told Bell he

would have a job in a couple of days.  (*Id.*)  Klein then contacted a Tishman

superintendent, Mike Pinelli, about hiring additional laborers.  (Vitale Decl. for *Bell* Ex. 1

at 22–23.)  Pinelli declined to do so and told Klein to call the Union president, Frank

Noviello.  (*Id.*)  It appears that Klein did not call Noviello but did meet Noviello at the

job site at a later date to discuss adding a laborer to the job.  (*Id.* at 25, 34–35.)

According to Noviello, he told Klein that if a laborer reached the top of the OOWL, he

would be referred to the job.  (Smith Decl. Ex. 16 at 127.)  Bell in fact reached the top of

the OOWL and was referred to the WTC 7 site on May 12, 2004 but was laid off shortly

thereafter.  (Vitale Decl. for *Bell* Ex. 3 at 97.)  On or about May 28, 2004 Bell called

Klein and angrily complained that Klein had done nothing for him.  (*Id.* at 70–76; Vitale

Decl. for *Bell* Ex. 1 at 41.)  Klein spoke to Noviello within a day or so, at which time

Noviello remarked that Bell had "issues."  (Vitale Decl. for *Bell* Ex. 1 at 43, 45; Vitale

Decl. for *Bell* Ex. 2 at 87–88.)  Shortly thereafter Bell called Klein and recorded the

conversation.  In this conversation, Klein told Bell in substance that he had tried to get

Bell a job by calling Noviello but that Noviello said "I got other guys who . . . have

priority here [and] you know what . . . the guy's [Bell] got issues."  (Smith Decl. Ex. 24.)

Klein added that "I did what I could . . . they said no."  (*Id.*)  There are several ways to

interpret the recorded and unrecorded conversations among Bell, Klein, Pinelli, and

Noviello in January through May of 2004; however, the factual allegations when viewed

in the light most favorable to plaintiffs could lead a reasonable juror to conclude that the

Union president interfered with Bell's efforts to get a company-appointed job in

retaliation for Bell's prior complaints of discrimination.  In an analogous context, the

31

Supreme Court held that indirect retaliatory efforts come within Title VII's ambit.  *See Robinson v. Shell*, 519 U.S. 337, 346 (1997) (finding that Section 2000e applies to retaliatory negative job references given by former employers because Title VII's primary purpose is to "[m]aintain[] unfettered access to statutory remedial mechanisms"). The Court finds that Bell's retaliation claim survives summary judgment.


**IV.    Plaintiffs' State Law Claims**

In the absence of a federal claim by 17 of the 18 plaintiffs, the Court declines to exercise supplemental jurisdiction over their state law claims.  *See Seabrook v. Jacobson*, 153 F.3d 70, 72 (2d Cir. 1998) (noting that it is particularly appropriate for the district court to dismiss where "the federal claim on which the state claim hangs has been dismissed"); *see also Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001); *Moskovits v. New York City Housing Authority*, 99 Civ. 4114, 2000 WL 633338, at *2 (S.D.N.Y. May 17, 2000) (declining to exercise supplemental jurisdiction over related state claims after § 1983 claim dismissed on summary judgment).  All claims by plaintiff Bell remain pending before the Court.

## CONCLUSION

For the reasons stated, defendants' motions for summary judgment as to plaintiffs in case 03 Civ. 4399 is GRANTED **[76]**.  Defendants' motion for summary judgment on the claim of Cecil Bell (04 Civ. 6520) is DENIED **[9]**.  The Clerk of the Court is directed to close case 03 Civ. 4399.


SO ORDERED.


Dated: New York, New York
       September **29**, 2009

                                        Richard J. Holwell
                                        United States District Judge

33